**In re John ROBERTSON, Appellant.**

**Nos. 00–FM–925, 04–FM–1269.**

District of Columbia Court of Appeals.

Argued Jan. 9, 2007.
Decided Jan. 24, 2008.

---

Lee Richard Goebes, Public Defender Service, with whom James Klein, Public Defender Service, and Jaclyn S. Frankfurt, Public Defender Service, were on the brief, for appellant.

Janice Y. Sheppard, Assistant Attorney General, District of Columba, with whom Robert J. Spagnoletti, Attorney General at the time, Linda Singer, Acting Attorney General at the time, and Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.

Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Assistant United States Attorney, filed a brief at the request of the court.

Joan S. Meier filed a brief for Amici Curiae Domestic Violence Legal Empowerment and Appeals Project (DV LEAP), AYUDA, Break the Cycle, D.C. Coalition Against Domestic Violence, and Women Empowered Against Violence (WEAVE), in support of appellee.

Before FARRELL and REID, Associate Judges, and KERN, Senior Judge.

REID, Associate Judge:

Appellant, John Robertson, appeals from the trial court's denial of his motion to vacate his criminal contempt convictions (Appeal No. 04–FM–1269). He essentially contends that (1) the trial court violated his due process rights by failing to vacate his contempt conviction in light of his plea agreement with the United States Attorney's Office for the District of Columbia ("United States Attorney's Office"); and (2) the trial court erred by failing to find that his trial counsel rendered ineffective assistance of counsel when he did not move to dismiss the criminal contempt proceeding on the basis of the plea agreement.

Mr. Robertson also lodged an earlier appeal challenging his criminal contempt convictions in the trial court (Appeal No. 00–FM–925). After a bench trial, the court had found him guilty of three counts of violating a civil protection order ("CPO") obtained by Ms. Watson. He claims that the trial court erred by (1) misapplying the law of self-defense with respect to one count of his criminal contempt convictions; and (2) rejecting his demand for a jury trial.

Following oral argument relating to these consolidated appeals, we invited the United States Attorney to file a brief pertaining to the appeal concerning the alleged violation of Mr. Robertson's plea agreement, and we requested responses to the government's brief from Mr. Robertson and Ms. Watson. In addition, we granted the request of several public interest groups to file an amicus brief in support of Ms. Watson.

We hold that the trial court (1) did not violate Mr. Robertson's plea agreement with the United States' Attorney's office by permitting Ms. Watson to enforce her CPO against him, and (2) for that reason, correctly ruled that Mr. Robertson's right to the effective assistance of counsel had not been violated (Appeal No. 04–FM–1269). In addition, we conclude that the trial court correctly rejected Mr. Robertson's claim of self-defense and his demand for a jury trial.

**FACTUAL SUMMARY**

The record shows that on March 29, 1999, Ms. Watson filed a "Petition and Affidavit For Civil Protection Order" in the Family Division, Domestic Relations Branch, of the Superior Court. She alleged that on March 27, 1999, Mr. Robertson repeatedly pursued and hit her on various parts of her body, including her head and face, with his closed fist; kicked her several times in the head with his heavy work shoes; and threatened to kill her while holding a pocket knife. She suffered a black eye and head injuries. At

Ms. Watson's request, the Family Division issued a temporary protection order on March 29, 1999. On April 26, 1999, the Office of Corporation Counsel (now the Office of the Attorney General for the District of Columbia ("OAG")) entered its appearance on behalf of Ms. Watson in the Family Court, and after a hearing that same day, the Domestic Violence Unit of the Superior Court issued a CPO, effective for twelve months, ordering that Mr. Robertson not assault, threaten, harass, or physically abuse Ms. Watson in any manner; stay away from Ms. Watson's person, home, and workplace; and avoid contacting Ms. Watson in any manner.

On March 29, 1999, Mr. Robertson was charged by complaint in the Superior Court, Criminal Division, with one count of aggravated assault based on the March 27, 1999, incident. On July 8, 1999, a grand jury indicted Mr. Robertson on one count of aggravated assault and two counts of assault with a dangerous weapon. On July 20, 1999, Mr. Robertson entered into a plea agreement with the United States Attorney's Office in which he agreed to plead guilty to one count of felony attempted-aggravated assault related to the March 27, 1999 incident, and in return the United States agreed that it would "not pursue any charges concerning an incident on June 26, [19]99."

On January 28, 2000, Ms. Watson, represented by Corporation Counsel, filed a motion to adjudicate Mr. Robertson in criminal contempt for violations of the CPO, based on incidents between Mr. Robertson and Ms. Watson on June 26 and 27, 1999. She also made a motion to modify and extend the CPO. To support her motion to adjudicate contempt, Ms. Watson submitted an affidavit stating, in part, that (1) on June 26, Mr. Robertson "harassed [her] by repeatedly demanding that [she] drop the criminal charges that were pending against him," and he called her names

(Count 1); (2) on June 26, Mr. Robertson "pushed [her] and knocked [her] into a wall" and called her names (Count 2); (3) on June 26/27, around midnight, Mr. Robertson harassed her by repeatedly cursing her (Count 3); (4) on June 26/27, after midnight, Mr. Robertson "physically attacked [her] in the living room," and followed her into the bathroom where he "repeatedly punched [her] in the head and face" (Count 4); (5) and on June 27, a short time after the living room and bathroom incident, Mr. Robertson "threw drain cleaner at [her]" and caused "lye burns" resulting in her hospitalization in an intensive care unit (Count 5). During a status hearing on April 4, 2000, the parties agreed to extend the CPO, which had been modified by consent on January 31, 2000, until May 30, 2000.

Mr. Robertson filed a demand for a jury trial on April 3, 2000, which Ms. Watson opposed. On May 9, 2000, the Family Court entered an order rejecting Mr. Robertson's jury trial demand and proceeded on May 10 and 11, 2000, with a bench trial to resolve the motion to adjudicate criminal contempt and the motion to modify and extend the CPO. After hearing testimony from Ms. Watson and her mother, Jacqueline Watson, and from defense witness, Vallace Player, and crediting that of Ms. Watson with respect to the first and second counts, the trial judge found beyond a reasonable doubt that Mr. Robertson "harassed Ms. Watson [on June 26, 1999] by making his request that she drop criminal charges and calling her names and . . . by pushing her into a wall [Counts 1 and 2]." The court determined that "[i]n doing those acts he violated willfully the [CPO]." With respect to Counts 3 and 4, the trial court credited the testimony of Ms. Player that all three persons in the house that night "were cursing and behaving in . . . an abominable fashion," and that Ms. Watson was the instigator of the fight because she taunted Mr. Robertson, opened a can

of draino over which Mr. Robertson and Ms. Watson fought and bit each other. The court found Mr. Robertson not guilty of Counts 3 and 4. As for the final count, Count 5, "the throwing of the lye," the trial court credited Ms. Player's testimony. After it was clear that Mr. Robertson "had won the fight convincingly," and "Ms. Watson was down on the ground bleeding badly," Ms. Player asked Mr. Robertson to leave. The trial court found that Mr. Robertson "had ten seconds to get away," but "[i]nstead [Mr. Robertson] stayed there, [ ] had the lye in [his] hand and ... threw it on [Ms. Watson]." The court determined that Mr. Robertson's assault in throwing the lye at that point was not "any kind of self-defense." Consequently the court adjudged him guilty of Count 5.

Following the trial court's finding on May 11, 2000, that Mr. Robertson was guilty of three counts, the trial judge sentenced him to three consecutive 180–day jail terms, with execution of one of those sentences suspended in favor of five years of probation. The court also ordered Mr. Robertson to pay $10,009.23 in restitution pertaining to medical expenses incurred by Ms. Watson which were paid from the Victims of Crime Compensation Fund. Mr. Robertson filed a timely appeal.

Years later, on November 13, 2003, Mr. Robertson filed a motion, pursuant to D.C.Code § 23–110, to vacate his contempt convictions on the grounds that the contempt proceeding violated his July 28, 2000 plea agreement with the United States.[1] He further argued that his convictions should be vacated because "his trial counsel was ineffective in failing to ... move to dismiss the [contempt charges], when the government was pursuing criminal charges

in violation of a binding plea agreement." Ms. Watson filed an opposition to the motion on January 23, 2004. In an order signed on August 27, 2004, the trial court denied Mr. Robertson's motion to vacate the convictions, (1) "find[ing] that the plea agreement ... is binding only on the government and not on any party seeking to vindicate a right against the respondent arising from the events of June 26, 1999"; and (2) "conclud[ing] that the Office of Corporation Counsel is not acting as a prosecutor but more as an 'aid' to the petitioner," and that "the private practitioner is therefore not bound by a plea agreement entered into by government prosecutors in another case." Mr. Robertson filed a timely appeal.

## ANALYSIS

### *Pertinent Statutory Background: Intrafamily Offenses*

In 1982, the Council of the District of Columbia, the District's legislature, determined that it was essential to strengthen the law regarding intrafamily offenses because "[e]xisting remedies have been shown to be inadequate in aiding victims in preventing further abuse." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 4–195, THE PROCEEDINGS REGARDING INTRAFAMILY OFFENSES AMENDMENT ACT OF 1982, May 12, 1982, at 2. Consequently, the Council decided "to fill in ... areas of need in the current District law." *Id.* Measures taken to fill in these areas of need included: (1) "authorizing private rights of action whereby victims of intrafamily offenses may seek protective orders without necessarily going through the Office of the Corporation Counsel";[2] (2) "expanding coverage of the

---

1. Along with the motion to vacate Mr. Robertson filed a request with the Court of Appeals to stay the briefing schedule in the appellate case, pending resolution of the November 13, 2003 motion by the trial court.

2. The 1982 amendment added language to D.C.Code § 16–1003(a) specifying that "In the alternative to referral to the Corporation Counsel, a complainant on his or her own

current law ..."; and (3) "authorizing civil protection cases to coexist legally along side criminal prosecutions against the same person by providing certain due process protections to the respondent." *Id.* at 2, 3.[3] Thus, the Council enhanced a distinct statutory scheme for handling intrafamily offenses and protecting victims against further abuse. The Council created a system under which enforcement of the statutory objectives could be accomplished not only through criminal charges brought by the United States Attorney's Office, but also through the right of a victim or complainant to seek a protective order and, concomitantly, to file a motion for contempt pursuant to D.C.Code § 16–1005 to enforce the CPO. *See Green v. Green,* 642 A.2d 1275, 1279 (D.C.1994); *In re Peak,* 759 A.2d 612, 620 n. 16 (D.C.2000) ("*Green* arose in the special context of 'an intrafamily proceeding, conducted pursuant to local statutes and rules designed by the Council of the District of Columbia ... to expedite the application and, if necessary, the enforcement of [Civil Protection Orders] in cases involving domestic violence.' *Green,* [ ] 642 A.2d at 1279"). Our analysis of Mr. Robertson's arguments, as well as those of the United States and the District, proceeds in light of this pertinent statutory background.

### Arguments of the Parties and Standard of Review

Mr. Robertson argues that the United States, not Ms. Watson, was "the true party-in-interest to the contempt proceeding"; that under D.C.Code § 16–1005(f), the action against him "was maintained 'in the name of' the relevant sovereign, ... the United States"; and that "there is no such thing in our legal system as a criminal action maintained 'in the name of' a private person." He asserts that in "prosecuting [him] for criminal contempt for his alleged behavior on June 26, 1999, the United States breached the plea agreement it entered on July 28, 1999." Further, Mr. Robertson contends that "[his] trial counsel rendered ineffective assistance of counsel by failing to move to dismiss the criminal contempt prosecution as violation of the plea agreement executed on July 28, 1999." Alternatively, Mr. Robertson asserts that his conviction for throwing the lye on Ms. Watson should be vacated because (1) the trial court's denial of his self-defense claim was based on an

---

initiative may file a petition for civil protection in the Family Division."

**3.** One of the provisions added was D.C.Code § 16–1002(c). D.C.Code § 16–1002 provides:

(a) If, upon the complaint of any person of criminal conduct by another or the arrest of a person charged with criminal conduct, it appears to the United States Attorney for the District of Columbia (hereafter in this subchapter referred to as the "United States attorney") that the conduct involves an intrafamily offense, he shall notify the Director of Social Services. The Director of Social Services may investigate the matter and make such recommendations to the United States attorney as the Director deems appropriate.

(b) The United States attorney may also (1) file a criminal charge based upon the

conduct and may consult with the Director of Social Services concerning appropriate recommendations for conditions of release taking into account the intrafamily nature of the offense; or (2) refer the matter to the Attorney General for the filing of a petition for civil protection in the Family Division. Prior to any such referral, the United States attorney shall consult with the Director of Social Services concerning the appropriateness of the referral.

(c) The institution of criminal charges by the United States attorney shall be in addition to, and shall not affect the rights of the complainant to seek any other relief under this subchapter. Testimony of the respondent in any civil proceedings under this subchapter and the fruits of that testimony shall be inadmissible as evidence in a criminal trial except in a prosecution for perjury or false statement.

erroneous application of this jurisdiction's self-defense laws; and (2) the trial court erred in rejecting his demand for a jury trial on the ground that his contempt prosecution constituted a "petty offense."

The United States maintains that "The criminal contempt prosecution in the present case was conducted as a private action brought in the name and interest of [Ms.] Watson, not as a public action brought in the name and interest of the United States or any other governmental entity." And the action was styled and prosecuted as one between Ms. Watson and Mr. Robertson, with the Corporation Counsel's office "acting in a representative capacity on [Ms.] Watson's behalf, not on behalf of the United States government, the District of Columbia government, or any other governmental entity." Furthermore, the government contends that Mr. Robertson's plea agreement with the United States Attorney's Office "could not reasonably be read as a promise that [Ms.] Watson would not bring a private action in her own name and interest seeking an adjudication of criminal contempt"; nor could it "properly be interpreted as a promise that [Mr.] Robertson would not be subject to prosecution for criminal contempt in the name of the District of Columbia."

The District focuses, in part, on D.C.Code § 16–1002(c) in arguing that "in addition to criminal charges filed by the United States Attorney, Ms. Watson had a right to enforce the CPO through a criminal contempt proceeding and the United States Attorney's Office had no authority to bargain away this right." In addition, the District asserts that "the United States alone agreed not to pursue any charges against Mr. Robertson," and since "[t]he United States and the District of Columbia are separate entities with distinct legal existence[ ]," "the actions of one cannot bind the other." [4]

The question as to whether the terms of the plea agreement between Mr. Robertson and the United States Attorney's Office bind Ms. Watson is a legal issue which we review *de novo. Louis v. United States,* 862 A.2d 925, 928 (D.C.2004) (the court "interprets the terms of the plea agreement *de novo* and ... reviews the [trial court's] factual findings regarding alleged breaches of the plea agreement for clear error.") (quoting *United States v. Gary,* 351 U.S.App. D.C. 380, 383, 291 F.3d 30, 33 (2002) (internal quotation marks omitted)).

### Discussion

In our view, the arguments of the United States and the District are more persuasive and more closely reflect the 1982 legislative purpose in granting to victims of intrafamily offenses a central role in the enforcement of the intrafamily offenses statute. As we noted in *Green, supra,*

> [T]he Council intended that considerations supporting a private right of action to seek a CPO apply equally to a private right of action to enforce the CPO through an intrafamily contempt proceeding. *See* D.C.Code § 16–1005(f) ("Violation of any temporary or permanent order issued under this chapter and failure to appear as provided in subsection (a) shall be punishable as contempt.").

**4.** The various *amici curiae* generally stress the importance of private enforcement of the intrafamily offense statute, asserting in part that "it is unlikely that criminal prosecutions can be expected to fill the need for enforcement of all CPOs, given the enormous pressure on the resources of the [United States Attorney's Office] and the high volume of minor CPO violations." *Amici* rely on *Green, supra,* indicating that: "The *Green* [c]ourt correctly stated that the Intrafamily Offenses Act 'reflect[s] a determination by the Council that the beneficiary of a CPO should be permitted to enforce that order through an intrafamily proceeding.' 642 A.2d at 1279 and n. 7. . . ."

642 A.2d at 1279–80 n. 7. As the District's legislature acknowledged in 1982, the Office of the Corporation Counsel (now the OAG) lacked the resources to meet the increasing demands for protection under the intrafamily offenses statute. *Id.* Indeed, following oral argument in *Green*, the District filed a motion to supplement the record, which we granted. The supplement revealed that " 'Corporation Counsel prosecutes less than 10 percent of the criminal contempt motions brought for violations of civil protection orders, and has only one counsel available for that duty.' " *Id.* Consequently, "to expedite the application and, if necessary, the enforcement of CPOs in cases involving domestic violence, ... the Council [determined] that the beneficiary of a CPO should be permitted to enforce that order through an intrafamily contempt proceeding." *Id.* at 1279–80 (footnote omitted). And, D.C.Code § 16–1005(f) and Super. Ct. Dom. V.R. 12(d) authorize an individual to file a motion to adjudicate criminal contempt.[5]

■■■ Mr. Robertson describes the contempt proceeding brought against him by Ms. Watson as a "criminal action," and asserts that such an action could only be brought "in the name of the relevant sovereign, ... the United States." Mr. Rob-

ertson's characterization of the proceeding against him loses sight of the special nature of criminal contempt. As Justice Blackmun said in *United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), criminal contempt is "a special situation." *Id.* at 742, 113 S.Ct. 2849 (Blackmun, J., concurring in part and dissenting in part). " '[Criminal contempt] proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws.' " *Id.* at 742, 113 S.Ct. 2849 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 799–800, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)). That is, "[t]he purpose of contempt is not to punish an offense against the community at large but rather to punish the specific offense of disobeying a court order." *Id.* Furthermore, " '[a] court, enforcing obedience to its orders by proceedings for contempt, is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to.' " *Id.* (quoting *In re Debs*, 158 U.S. 564, 596, 15 S.Ct. 900, 39 L.Ed. 1092 (1895)). In short, as the United States maintains, "[t]he criminal contempt prosecution in [this] case was conducted as a private action brought in the name and interest of [Ms.] Watson, not as a public action brought in the name and

---

5. D.C.Code §§ 16–1005(f) and (g) currently provide:

(f) Violation of any temporary or final order issued under this subchapter, or violation in the District of Columbia of any valid foreign protection order, as that term is defined in subchapter IV of this chapter, and respondent's failure to appear as required by § 16–1004(b), shall be punishable as contempt. Upon conviction, criminal contempt shall be punished by a fine not exceeding $1,000 or imprisonment for not more than 180 days, or both.

(g) Any person who violates any protection order issued under this subchapter, or any person who violates in the District of Columbia any valid foreign protection or-

der, as that term is defined in subchapter IV of this chapter, shall be chargeable with a misdemeanor and upon conviction shall be punished by a fine not exceeding $1,000 or by imprisonment for not more than 180 days, or both.

Super. Ct. Dom. V.R. 12(d) specifies, in pertinent part:

(d) Motion to adjudicate criminal contempt. A motion requesting that the court order a person to show cause why she/he should not be held in criminal contempt for violation of a temporary protection order or civil protection order may be filed by an individual, Corporation Counsel or an attorney appointed by the Court for that purpose. ...

interest of the United States or any other governmental entity." Thus, the unique statute governing intrafamily offenses, which authorizes an individual to file a motion to adjudicate criminal contempt against one who violates a CPO, does not contravene the general principle that criminal prosecutions are prosecuted in the name of the sovereign, the United States, or where statutes specify, the District of Columbia.

■ Consequently, we agree with the United States and the District and we hold that, under the intrafamily offense statute, a criminal contempt proceeding is properly brought in the name of a private person, here Ms. Watson, rather than in the name of the sovereign. *See Green, supra,* 642 A.2d at 1279. This statutory scheme which permits a private person to file a motion to adjudicate criminal contempt does not stand alone in the District. A comparable statutory framework exists in the area of enforcement of child support orders. D.C.Code § 46–225.02(a) (2005) provides that "[t]he Mayor *or any party who has a legal claim to any child support* may initiate a criminal contempt action for failure to pay the support by filing a motion in the civil action in which the child support order was established" (emphasis added). *See In re Warner,* 905 A.2d 233 (D.C.2006); *Rogers v. Johnson,* 862 A.2d 934 (D.C.2004).

We cannot agree with Mr. Robertson's arguments that Supreme Court decisions in *Dixon* and *Young, supra,* and our decision in *Peak, supra,* undermine the criminal contempt provision in the District's intrafamily offense statute, which allows a private person to enforce a CPO order. Mr. Robertson contends that *Dixon*

"leaves no doubt that D.C.Code § 16–1005(f) actions are maintained 'in the name of' the United States." He also asserts that "as ... *Dixon* [ ] established, a private contempt prosecutor can foreclose the public prosecutor's ability itself to prosecute a criminal case by herself first litigating a private contempt action that raises a jeopardy bar." That *Dixon* was a complicated case is clear from the extensive, multiple opinions written by Justices Scalia (announcing the judgment of the court), Rehnquist (concurring in part and dissenting in part with two other justices), White (concurring in the judgment in part and dissenting in part with two other justices), Blackmun (concurring in the judgment in part and dissenting in part), and Souter (concurring in the judgment in part and dissenting in part with one other justice). Significantly, as the United States correctly points out, however, "the Court's holding in *Dixon* did not turn on the premise that the prior contempt prosecution was conducted in the name and interest of the United States—rather, it turned on the premise that the identity of the prosecutor in the earlier proceeding was simply irrelevant for Double Jeopardy Clause purposes."[6] In that regard, *Green* is not inconsistent with *Dixon.* In addition, what we said in *Green* is true with respect to Mr. Robertson's case—*Dixon* "simply does not apply to the circumstances presented by this appeal." *Green,* 642 A.2d at 1278 (footnote omitted).

Mr. Robertson's reliance on *Young* is also unavailing. Notably, plaintiff's counsel in *Young* conducted a "sting" operation relating to an investigation of the defendants' alleged violation of a federal court injunction prohibiting infringement of

---

6. Of course, where the "dual sovereignty" principle governs, the identity of the prosecutor is relevant for double jeopardy purposes, *see, e.g., United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), but even that "concept does not apply ... in every instance where successive cases are brought by nominally different prosecuting entities." *Id.* at 318, 98 S.Ct. 1079. *Dixon* was an instance of the latter.

plaintiff's trademark, and plaintiff's counsel also prosecuted the defendants for contempt. *Young*, 481 U.S. at 791–92, 107 S.Ct. 2124. The Supreme Court held "that counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order." *Id.* at 790, 107 S.Ct. 2124. Thus, as we declared in *Green*, "the *Young* Court was primarily concerned with the financial and tactical conflicts of interest presented by using plaintiff's counsel to prosecute the criminal contempt charges." *Id.* at 1279 (citing *Young, supra*, 481 U.S. at 805–06, 107 S.Ct. 2124). "In contrast, the instant criminal contempt arose out of an intrafamily proceeding, conducted pursuant to local statutes and rules designed by the Council of the District of Columbia [ ] to expedite the application and, if necessary, the enforcement of CPOs in cases involving domestic violence." *Id.* (citations omitted).

*Peak* also is inapplicable to Mr. Robertson's case. There, we distinguished the situation in *Peak* from that in *Green* "which arose in the special context of 'an intrafamily proceeding ....' "; and we further declared that the *Peak* decision "casts no doubt on the propriety of the contempt procedures authorized in that context by the Superior Court's Intra–Family rules." 759 A.2d at 620 n. 16 (citation omitted). In short, the decisions in *Dixon, Young,* and *Peak* do not alter our conclusion that the criminal contempt proceeding against Mr. Robertson under the District's intrafamily offense statute was prosecuted in the name of Ms. Watson, not in the name of the United States or the District of Columbia.

### *Mr. Robertson's Plea Agreement With the United States Attorney's Office*

Mr. Robertson essentially argues that Ms. Watson's contempt proceeding against him was barred by his plea agreement with the United States Attorney's Office. "[A] plea agreement is a contract." *United States v. Jones,* 313 U.S.App. D.C. 128, 131, 58 F.3d 688, 691 (1995) (citation omitted). "As a consequence, courts will look to principles of contract law to determine whether the plea agreement has been breached." *Id.* (citations omitted); *see also United States v. Ahn,* 343 U.S.App. D.C. 392, 401, 231 F.3d 26, 35 (2000) (citation omitted). The District applies an objective law of contracts and looks to the written language of the parties to determine the reasonable interpretation of the agreement. *See Tillery v. District of Columbia Contract Appeals Bd.,* 912 A.2d 1169, 1176 (D.C.2006) (citations omitted).

As we have shown, Mr. Robertson starts from the faulty assumption that the criminal contempt proceeding against him was brought in the name of the United States. To interpret Mr. Robertson's plea agreement, we apply contract principles, examining the language of the agreement to determine the intent of the parties. The plea agreement was entered on a form styled "United States vs. John Robertson." The District of Columbia, whose name appeared under that of the United States, was crossed out. Mr. Robertson, his attorney, and an Assistant United States Attorney signed the form. The words "Assistant Corporation Counsel," which appeared under the words "Assistant U.S. Attorney," were crossed out. Ms. Watson's name appeared nowhere on the form. In addition, the pertinent handwritten narrative stated: "In exchange for Mr. Robert[son's] plea of guilty to Attem[pted] Aggravated Assault, the gov't agrees ... not [to] pursue any charges concerning an incident on 6–26–99." The abbreviated word "gov't" clearly referred to the United States, not Ms. Watson, and certainly not the District of Columbia since that name was deleted. Moreover, only a representative of the United States and Mr. Robert-

son and his counsel signed the plea agreement. Under these circumstances, we are satisfied that no objectively reasonable person could understand that Mr. Robertson's plea agreement bound Ms. Watson and precluded her contempt proceeding against Mr. Robertson,[7] or that the agreement bound the District, a distinct, separate governmental entity[8] (whose Corporation Counsel's Office represented Ms. Watson during her prosecution of her motion to adjudicate contempt). *See United States v. Garcia,* 954 F.2d 12, 17 (1st Cir. 1992) ("a defendant's subjective expectations as to how a plea agreement will redound to his benefit are enforceable, if at all, only to the extent that they are *objectively reasonable"*) *(citations omitted).*

### Mr. Robertson's Other Arguments

We dispose of Mr. Robertson's other arguments summarily. In light of our conclusions pertaining to Mr. Robertson's plea agreement, we reject his contention that his trial counsel "rendered [constitutionally] ineffective assistance of counsel by failing to move to dismiss the criminal contempt prosecution as violative of the plea agreement executed on July 28, 1999." Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),

Mr. Robertson's counsel's conduct was reasonable under prevailing professional norms. *See Stewart v. United States,* 881 A.2d 1100, 1113 (D.C.2005).

 Mr. Robertson argues that the "Family Court committed error in denying [his] demand for a jury trial," because, "although D.C.Code § 16–1005(f) sets forth a maximum period of incarceration of 180 days, the $10,000 restitution penalty imposed on [him], viewed in tandem with this maximum period of incarceration and the five-year maximum period of probation, undoubtedly served to remove this case from the category of 'petty' offense." The record shows that in filing her motion to modify and extend civil protection order, apparently simultaneously with her motion to adjudicate contempt, Ms. Watson demanded payment for her medical bills (around $10,000) resulting from the burns caused by Mr. Robertson when he threw lye at her. Because of this demand, which Mr. Robertson interpreted, in part, as an effort to obtain personal injury damages, he argued that he was entitled to a jury trial under both the Sixth and Seventh Amendments to the Constitution. The trial court denied his jury demand.[9]

---

7. That is especially so given § 16–1002(c), which states that "[t]he institution of criminal charges by the United States Attorney shall ... not affect the rights of the [CPO] complainant to seek any other relief under this subchapter," including-implicitly-a contempt adjudication under § 16–1005(f).

8. *See Johnson v. District of Columbia,* 853 A.2d 207, 210 n. 6 (D.C.2004) (citing *Randolph v. District of Columbia,* 156 A.2d 686, 688 (D.C.1959); *District of Columbia v. Ray,* 305 A.2d 531, 534 (D.C.1973)).

9. There is some confusion in the record as to whether the $10,000 restitution requirement for medical bills (payable to the Victims of Crime Compensation Fund) was imposed as part of Mr. Robertson's sentence, or as part of the modification of the CPO. At the June 14,

2000 hearing where the trial court imposed sentence and extended and modified the CPO, the trial court stated that it was suspending execution of the incarceration penalty "and putting [Mr. Robertson] on a five year period of probation with the condition that you pay $10,000 in restitution." A few minutes later the trial court "move[d] on to the [CPO]" and there also was a reference to restitution and the $10,000 payment. Before the trial court imposed sentence, counsel for Ms. Watson stated that they had "formally asked for the restitution in the modified and extended [CPO]," but that "whether it be done through the contempt proceeding or through the modification of the [CPO], we do think that a restitution is appropriate [and] that total came to just over $10,000...." Mr. Robertson does not press his Seventh Amendment contention in this court.

■ In *Olafisoye v. United States*, 857 A.2d 1078 (D.C.2004), we reiterated the principle that "while federal and state courts must provide jury trials for all 'serious crimes,' trials for offenses that are regarded as 'petty' do not require the same treatment." *Id.* at 1083 (citing *Duncan v. Louisiana*, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)). Moreover, "[t]he factor that distinguishes a serious offense from a petty offense is the 'maximum authorized period of incarceration.'" *Id.* (citing *Blanton v. City of North Las Vegas*, 489 U.S. 538, 541–42, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989)). "*Blanton* established a presumption that crimes punishable by incarceration of six months or less were not deemed serious for jury trial purposes." *Id.* (citing *Blanton, supra,* at 542–43, 109 S.Ct. 1289; *Day v. United States*, 682 A.2d 1125, 1128 (D.C. 1996)). On this record, where the maximum statutory penalty is a fine not exceeding $1,000, or a period of incarceration up to 180 days; and where the $10,000 payment was earmarked as restitution or reimbursement for Ms. Watson's medical expenses paid by the Victims of Crime Compensation Fund, we conclude that Mr. Robertson was not constitutionally entitled to a jury trial; under *Olafisoye* and *Blanton, supra,* his offense is classified as "petty" rather than "serious." *Cf. Nebraska v. Clapper*, 273 Neb. 750, 732 N.W.2d 657, 662–63 (2007) (no violation of Sixth Amendment where court ordered defendant to pay $18,862.72 in restitution to victim for medical expenses; "a judge's factfinding for restitution does not result in a sentence that exceeds a statutory maximum"); *United States v. Milkiewicz*, 470 F.3d 390, 403 n. 24 (1st Cir.2006) ("Although restitution is 'criminal' in many senses, . . . we note that some courts have concluded that restitution is not the sort of 'punishment' to which the Sixth Amendment apples") (citations omitted); *United States v. Leahy*, 438 F.3d 328, 337 (3d Cir.2006) ("restitution order does not punish a defendant beyond the 'statutory maximum' as that term has evolved in the Supreme Court's Sixth Amendment jurisprudence") (citations omitted). *See also United States v. Nachtigal*, 507 U.S. 1, 5, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) (sentence which included five years of probation was not an infringement on liberty that required a jury trial under the Sixth Amendment).

■ Finally, Mr. Robertson asserts that the trial court "misapplied the law of self-defense." The trial court essentially found that after "Mr. Robertson had won the fight [with Ms. Watson] convincingly, Ms. Watson was down on the ground bleeding badly." At Ms. Player's request, Mr. Robertson left her house, but remained on the premises instead of walking away. The trial court credited Ms. Player's testimony and found that Mr. Robertson "had ten seconds to get away," but remained there with lye in his hands and "threw it on [Ms. Watson]." Case law in this jurisdiction holds that "[w]hen a defendant raises a claim of self-defense, the trial court must decide, as a matter of law, whether there is record evidence sufficient to support the claim." *Howard v. United States*, 656 A.2d 1106, 1111 (D.C.1995). Moreover, the trial court here was the factfinder in adjudicating Mr. Robertson's self-defense claim, and she applied correct legal standards in rejecting it. "[S]elf-defense may not be claimed by one who deliberately places himself . . . in a position where he . . . has reason to believe his . . . presence . . . would provoke trouble." *Id.* (citations and internal quotation marks omitted). What we said in *Gillis v. United States*, 400 A.2d 311 (D.C.1979) supports the trial court's rejection of Mr. Robertson's self-defense claim with respect to Count 5 of the charges against him:

[The] middle ground between the two extremes [of] the right to stand and kill,

and the duty to retreat to the wall before killing[,] imposes no duty to retreat.... But this middle ground does permit [the fact finder] to consider whether a defendant, if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm. In short, this rule permits the [fact finder] to determine if the defendant acted too hastily, was too quick to pull the trigger. A due regard for the value of human life calls for some degree of restraint before inflicting serious or mortal injury upon another.

*Id.* at 313. Given the trial court's credibility determination and its factual findings, we see no reason to disturb its rejection of Mr. Robertson's claim to self-defense.

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court in Appeal No. 00–FM–925 and Appeal No. 04–FM–1269.

*So ordered.*