(Slip Opinion) Cite as: 560 U. S. ____ (2010) 1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–6261

_____

## JOHN ROBERTSON, PETITIONER *v.* UNITED STATES EX REL. WYKENNA WATSON

ON WRIT OF CERTIORARI TO THE DISTRICT OF COLUMBIA COURT OF APPEALS

[May 24, 2010]

PER CURIAM.

The writ of certiorari is dismissed as improvidently granted.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–6261

_____

## JOHN ROBERTSON, PETITIONER *v.* UNITED STATES EX REL. WYKENNA WATSON

ON WRIT OF CERTIORARI TO THE DISTRICT OF COLUMBIA COURT OF APPEALS

[May 24, 2010]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE SOTOMAYOR join, dissenting.

This is a complicated case, but it raises a straightforward and important threshold issue. When we granted certiorari, we rephrased the question presented to focus on that issue: "Whether an action for criminal contempt in a congressionally created court may constitutionally be brought in the name and pursuant to the power of a private person, rather than in the name and pursuant to the power of the United States." 558 U. S ___ (2009). The answer to that question is no. The terrifying force of the criminal justice system may only be brought to bear against an individual by society as a whole, through a prosecution brought on behalf of the government. The court below held otherwise, relying on a *dissenting* opinion in one of our cases, and on the litigating position of the United States, which the Solicitor General has properly abandoned in this Court. See Brief for United States as *Amicus Curiae* 12–13, n. 3. We should correct the lower court's error and return the case to that court to resolve

the remaining questions.

I

In March 1999, Wykenna Watson was assaulted by her then-boyfriend, John Robertson. App. 40. Watson sought and secured a civil protective order against Robertson, prohibiting him from approaching within 100 feet of her and from assaulting, threatening, harassing, physically abusing, or contacting her. *Id.,* at 20. At the same time, the United States Attorney's Office (USAO) was independently pursuing criminal charges against Robertson arising from the assault.

On June 26, Robertson violated the protective order by again violently assaulting Watson. On July 8, he was indicted for the previous March incident; shortly thereafter, the USAO offered, and Robertson accepted, a plea agreement resolving those charges. *Id.,* at 26–30. At the top of the boilerplate plea form, the Assistant U. S. Attorney added in longhand: "In exchange for Mr. Robertson's plea of guilty to attempt[ed] aggravated assault, the gov't agrees to: DISMISS the [remaining] charges[,] [and] [n]ot pursue any charges concerning an incident on 6-26-99." *Id.,* at 28. The Superior Court accepted Robertson's plea and sentenced him to 1 to 3 years' imprisonment. *Id.,* at 30, 46, 53.

A few months later, Watson filed a motion to initiate criminal contempt proceedings against Robertson for violating the civil protective order, based on the June 26 assault. See D. C. Code §16–1005(f) (2009 Supp.); D. C. Super. Ct. Domestic Violence Rule 12(d) (Lexis 2010); *In re Robertson,* 940 A. 2d 1050, 1053 (D. C. 2008). After a 2-day bench trial, the court found Robertson guilty on three counts of criminal contempt and sentenced him to three consecutive 180-day terms of imprisonment, suspending execution of the last in favor of five years' probation. The court also ordered Robertson to pay Watson roughly

$10,000 in restitution. App. 2, 63–64. Robertson filed a motion to vacate the judgment, which the court denied.

Robertson appealed. Criminal contempt prosecutions, he argued, "are between the public and the defendant," and thus could "only be brought in the name of the relevant sovereign, . . . the United States." Brief for Petitioner 8, 10 (quoting Brief for Appellant in No. 00–FM–1269 etc. (D. C.), pp. 20–21, and 940 A. 2d, at 1057; internal quotation marks omitted). So viewed, the prosecution based on the June 26 incident could not be brought, because the plea agreement barred the "gov[ernmen]t" from pursuing any charges arising from that incident.

The Court of Appeals rejected Robertson's arguments, in a two-step holding. Step one: "the criminal contempt prosecution in this case was conducted as a private action brought in the name and interest of Ms. Watson, not as a public action brought in the name and interest of the United States or any other governmental entity." 940 A. 2d, at 1057–1058 (internal quotation marks and brackets omitted). Step two: because the criminal contempt prosecution was brought as an exercise of private power, that prosecution did not implicate a plea agreement that bound only the government. *Id.*, at 1059–1060.

We granted certiorari to review the first step of that holding.

## II

### A

Our decision in *United States* v. *Dixon*, 509 U. S. 688 (1993), provides the answer to the question presented here. The question in *Dixon* was one of double jeopardy— whether a private party's prosecution for criminal contempt barred the Government's subsequent prosecution for the "same criminal offense." *Id.*, at 696. The private prosecution in that case was brought under the same D. C. contempt law at issue here. *Id.*, at 692 (citing D. C. Code

§16–1005 (1989)).

We thought it "obvious" in *Dixon* that double jeopardy protections barred the Government's subsequent prosecution. 509 U. S., at 696. The Double Jeopardy Clause, of course, bars the second prosecution for the same offense only if that prosecution is brought by the same sovereign as the first. See *Heath* v. *Alabama*, 474 U. S. 82, 88–89 (1985). Thus, the only possible way the Government's *second* prosecution could have offended the Double Jeopardy Clause is if the Court understood the criminal contempt prosecution to be the Government's *first* prosecution—*i.e.*, one brought *on behalf of the Government*. See *United States* v. *Halper*, 490 U. S. 435, 451 (1989) ("The protections of the Double Jeopardy Clause are not triggered by litigation between private parties"), overruled on other grounds by *Hudson* v. *United States*, 522 U. S. 93 (1997).

That we treated the criminal contempt prosecution in *Dixon* as an exercise of government power should not be surprising. More than two centuries ago, Blackstone wrote that the king is "the proper person to prosecute for all public offenses and breaches of the peace, being the person injured in the eye of the law." 1 W. Blackstone, Commentaries *268. Blackstone repeated that principle throughout his fourth book. See, *e.g.*, 4 *id.,* at *2, *8, *177. Not long after Blackstone, then-Representative John Marshall agreed, stating on the House floor that "administer[ing] criminal judgment . . . is a duty to be performed at the demand of the nation, and with which the nation has a right to dispense. If judgment . . . is to be pronounced, it must be at the prosecution of the nation." 10 Annals of Cong. 615 (1800).

This principle has deep historical roots. See, *e.g.*, 1 F. Wharton, Criminal Law §10, p. 11 (9th ed. 1885) ("Penal justice . . . is a distinctive prerogative of the State, to be exercised in the service [of] the State"); see also J. Locke,

Second Treatise of Civil Government §88, pp. 43–44 (J. Gough ed. 1947) ("[E]very man who has entered into civil society, and is become a member of any commonwealth, has thereby quitted his power to punish offences against the law of nature in prosecution of his own private judgment[.] . . . [H]e has given a right to the commonwealth to employ his force for the execution of the judgments of the commonwealth" (footnote omitted)). As this Court has said before, "[c]rimes and offenses against the laws of any State can only be defined, prosecuted and pardoned by the sovereign authority of that State." *Huntington* v. *Attrill*, 146 U. S. 657, 669 (1892); see also *Heath*, *supra*, at 88 ("The dual sovereignty doctrine [of the Double Jeopardy Clause] is founded on the common-law conception of crime as an offense against the sovereignty of the government").

These core principles are embodied in the Constitution. The protections our Bill of Rights affords those facing criminal prosecution apply to "*any* person," "*any* criminal case," and "*all* criminal prosecutions." Amdts. 5, 6 (emphasis added). But those protections apply only against *the government*; "[i]ndividual invasion of individual rights" is not covered. *Civil Rights Cases*, 109 U. S. 3, 11 (1883) (Fourteenth Amendment). If the safeguards of the Bill of Rights are to be available in "all criminal prosecutions," then any such prosecution must be considered to be one on behalf of the government—otherwise the constitutional limits do not apply. "The Constitution constrains governmental action 'by whatever instruments or in whatever modes that action may be taken,'" *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 392 (1995) (quoting *Ex parte Virginia*, 100 U. S. 339, 346–347 (1880)), but the action still must be *governmental* action.

The court below, however, rejected this understanding, concluding that Watson's "criminal contempt prosecution" was not "a public action" but "a private action," such that it was not covered by an agreement binding the govern-

ment. 940 A. 2d, at 1057–1058 (internal quotation marks omitted). But as we have explained, "[t]he purpose of a criminal court is not to provide a forum for the ascertainment of private rights. Rather it is to vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant." *Standefer* v. *United States*, 447 U. S. 10, 25 (1980) (internal quotation marks omitted).

The holding below gives rise to a broad array of unsettling questions. Take the Due Process Clause. It guarantees particular rights in criminal prosecutions because the prosecutor is a state actor, carrying out a "duty *on the part of the Government*." *Kyles* v. *Whitley*, 514 U. S. 419, 433 (1995) (emphasis added). But if the criminal prosecution is instead viewed as "a private action," not an exercise of sovereign power, how would those rights attach? Cf. *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U. S. 189, 195–196 (1989). What about *Brady* v. *Maryland*, 373 U. S. 83 (1963)? The private prosecutor is likely to have evidence pertinent to the proceeding—particularly if, as here, the private prosecutor is also the victim of the crime. But if the prosecutor is not exercising governmental authority, what would be the constitutional basis for any *Brady* obligations? May the private prosecutor interview the defendant without *Miranda* warnings, since she is not acting on behalf of any sovereign but only in a private capacity? See *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

Our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another. The ruling below is a startling repudiation of that basic understanding.

## B

Despite the foregoing, the Court of Appeals determined

that Watson brought this criminal prosecution under her authority as a private citizen. 940 A. 2d, at 1058. To reach that conclusion, the court relied on Justice Blackmun's separate opinion in *Dixon*. See 940 A. 2d, at 1057 ("As Justice Blackmun said in *United States* v. *Dixon*, criminal contempt is 'a special situation.' [*Dixon*, 509 U. S., at 742 (opinion concurring in judgment in part and dissenting in part)]. . . . '[T]he purpose of contempt is not to punish an offense against the community at large but rather to punish the specific offense of disobeying a court order.' [*Ibid*.]" (citation omitted)). In fact, the court quoted from Justice Blackmun's separate opinion no fewer than four times. *Id.,* at 1057.

Justice Blackmun's opinion, however, was a partial concurrence in the judgment and partial dissent, and it garnered only one vote. Moreover, the portion of the opinion relied upon by the court below was the *dissenting* part. A majority of the Court squarely rejected Justice Blackmun's view, and did so in plain terms. See *Dixon*, 509 U. S., at 699–701 (opinion of SCALIA, J., joined by KENNEDY, J.); see *id.*, at 720 (White, J., joined by STEVENS and Souter, JJ., concurring in judgment in part and dissenting in part).

Before this Court, Watson understandably retreats from Justice Blackmun's dissenting opinion. Instead, she argues that "[i]n England and in America at the time of the Founding, prosecutions by victims of crime and their families were the rule, not the exception." Brief for Respondent 38–39. But such prosecutions, though brought by a private party, were commonly understood as an exercise of sovereign power—the private party acting on behalf of the sovereign, seeking to vindicate a public wrong.

In England, for example, private parties could initiate criminal prosecutions, but the Crown—entrusted with the constitutional responsibility for law enforcement—could

enter a *nolle prosequi* to halt the prosecution. See, *e.g.*, *King* v. *Guerchy*, 1 Black W. 545, 96 Eng. Rep. 315 (K. B. 1765); *King* v. *Fielding*, 2 Burr. 719, 720, 97 Eng. Rep. 531 (K. B. 1759); see also *King* v. *State*, 43 Fla. 211, 223, 31 So. 254, 257 (1901) (Private prosecutions in England were understood to be "conducted on behalf of the crown by the privately retained counsel of private prosecutors"); P. Devlin, The Criminal Prosecution in England 21 (1958).

Watson's arguments based on American precedent fail largely for the same reason: To say that private parties could (and still can, in some places) exercise some control over criminal prosecutions says nothing to rebut the widely accepted principle that those private parties necessarily acted (and now act) on behalf of the sovereign. See, *e.g.*, *Cronan ex rel. State* v. *Cronan*, 774 A. 2d 866, 877 (R. I. 2001) ("[A]ttorneys conducting private prosecutions stand in the shoes of the state"); *State* v. *Westbrook*, 279 N. C. 18, 36, 181 S. E. 2d 572, 583 (1971) ("The prosecuting attorney, whether the solicitor or privately employed counsel, represents the State"); Sidman, The Outmoded Concept of Private Prosecution, 25 Am. U. L. Rev. 754, 774 (1976) ("[T]he privately retained attorney becomes, in effect, a temporary public prosecutor"). Indeed, many of the state court authorities Watson herself cites expressly recognize this fundamental point. See, *e.g.*, *Katz* v. *Commonwealth*, 379 Mass. 305, 312, 399 N. E. 2d 1055, 1060 (1979) ("[I]t is clear with respect to the criminal aspects of the present case that the Commonwealth . . . is the adverse party").

We have no need to take issue with that proposition, but this case is different. The whole point of the ruling below was that this was not a "public action" that happened to be litigated by a private party, but "a private action brought in the name and interest of [Ms.] Watson." 940 A. 2d, at 1057–1058. That holding was critical in explaining why Watson's criminal action was not barred by a plea

agreement that bound the government.

Moving beyond criminal prosecutions generally, Watson next contends that contempt prosecutions are unique, and thus should be exempt from the general rule. See Brief for Respondent 24. If Watson means to argue that modern criminal contempts are not "crimes," that view was squarely rejected by this Court in *Bloom* v. *Illinois*, 391 U. S. 194 (1968). See *id.*, at 199–200 (holding that a criminal contempt prosecution is a criminal prosecution for the purposes of the Sixth Amendment); see also *id.*, at 201 ("Criminal contempt is a crime in the ordinary sense"); *United States* v. *Providence Journal Co.*, 485 U. S. 693, 700 (1988) ("The fact that the allegedly criminal conduct concerns the violation of a court order instead of common law or a statutory prohibition does not render the prosecution any less an exercise of the sovereign power of the United States").

In any event, even if contempt prosecutions might not always count as "crimes," this one undoubtedly does, as Watson herself concedes. Brief for Respondent 34 ("[T]his case was clearly a criminal contempt proceeding from beginning to end"). That concession is well taken, given that whether a particular punishment is criminal or civil is "a matter of statutory construction," *Hudson*, 522 U. S., at 99, and that the relevant provisions here make clear that contempt proceedings like this one are criminal, see D. C. Code §16–1005(f) ("[C]riminal contempt shall be punished by a fine not exceeding $1,000 or imprisonment for not more than 180 days, or both"); see also D. C. Super. Ct. Domestic Violence Rule 12(d) (labeled "Motion to adjudicate criminal contempt," and describing the violation as "criminal contempt"). As Justice Holmes put it for the Court: "These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English

speech." *Gompers* v. *United States*, 233 U. S. 604, 610 (1914).

The United States bears some responsibility for leading the court below astray. In that court, the Government argued that the criminal contempt prosecution was "'a private action brought in the name and interest of [Ms.] Watson, not . . . a public action brought in the name and interest of the United States or any other governmental entity.'" 940 A. 2d, at 1056 (quoting Brief for United States in No. 00–FM–925 etc. (D. C.)). The court below quoted that precise language in stating its conclusion. See 940 A. 2d, at 1057–1058 (same).

Before this Court, the Solicitor General has properly abandoned that position, and does not defend the lower court's decision on this issue. See Brief for United States as *Amicus Curiae* 12–13, n. 3 ("[T]he United States no longer believes the contempt prosecution at issue can be understood as a purely 'private action'"). We should do our part and correct the ruling of the court below.

### III

The ultimate issue in this case, of course, is whether the criminal contempt prosecution Watson initiated in January 2000 violated the plea agreement Robertson signed with the USAO in July 1999. The Court of Appeals said "no," based solely on its determination that Watson was exercising private—not sovereign—power. With that determination in hand, the ultimate plea agreement question was straightforward: If Watson was wielding purely private power, a plea agreement that by its terms bound only the "gov[ernmen]t" would not bind her.

With a proper view of Watson's role in this case, however, the plea agreement question becomes significantly more difficult. The Solicitor General argues that the agreement does not bar the contempt prosecution, even if that prosecution is correctly viewed as on behalf of the

sovereign. *Id.,* at 29–32. The difficult aspects of that legal issue, however, should not cause us to shy away from answering the fundamental threshold question whether a criminal prosecution may be brought on behalf and in the interest of a private party. Having decided that threshold question in favor of Robertson, I would remand to the court below to consider the plea agreement from the proper starting point.

In light of all the foregoing, it is worth stressing that the majority's determination not to decide that question "carries with it no implication whatever regarding the Court's views on the merits." *Maryland* v. *Baltimore Radio Show, Inc.,* 338 U. S. 912, 919 (1950) (Frankfurter, J., respecting denial of certiorari).

\*    \*    \*

Allegorical depictions of the law frequently show a figure wielding a sword—the sword of justice, to be used to smite those who violate the criminal laws. Indeed, outside our own courthouse you will find a statue of more than 30 tons, Authority of Law, which portrays a male figure with such a sword. According to the sculptor, James Earle Fraser (who also designed the buffalo nickel), the figure sits "wait[ing] with concentrated attention, holding in his left hand the tablet of laws, backed by the sheathed sword, symbolic of enforcement through law." Supreme Court of the United States, Office of the Curator, Contemplation of Justice and Authority of Law Information Sheet 2 (2009) (available in Clerk of Court's case file). A basic step in organizing a civilized society is to take that sword out of private hands and turn it over to an organized government, acting on behalf of all the people. Indeed, "[t]he . . . power a man has in the state of nature is the power to punish the crimes committed against that law. [But this] he gives up when he joins [a] . . . political society, and incorporates into [a] commonwealth." Locke, Second

Treatise, §128, at 64.

The ruling below contravenes that fundamental proposi-tion, and should not be allowed to stand.  At the very least, we should do what we decided to do when we granted certiorari, and took the unusual step of rephrasing the question presented: answer it.

I respectfully dissent from the Court's belated determi-nation not to answer that question.

# SUPREME COURT OF THE UNITED STATES

————

No. 08–6261

————

## JOHN ROBERTSON, PETITIONER *v.* UNITED STATES EX REL. WYKENNA WATSON

ON WRIT OF CERTIORARI TO THE DISTRICT OF COLUMBIA COURT OF APPEALS

[May 24, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE KENNEDY joins, dissenting.

THE CHIEF JUSTICE would hold that criminal prosecutions, including criminal contempt proceedings, must be brought on behalf of the government. I join his opinion with the understanding that the narrow holding it proposes does not address civil contempt proceedings or consider more generally the legitimacy of existing regimes for the enforcement of restraining orders.