**In re John ROBERTSON, Appellant.**

Nos. 00–FM–925, 04–FM–1269.

District of Columbia Court of Appeals.

Argued Jan. 9, 2007.

Decided Jan. 24, 2008.

Amended May 19, 2011.

Lee Richard Goebes, Public Defender Service, with whom James Klein, Public Defender Service, Jaclyn S. Frankfurt and Jessica Brand, Public Defender Service, were on the brief, for appellant.

Janice Y. Sheppard, Assistant Attorney General, District of Columbia, with whom Robert J. Spagnoletti, Attorney General at the time, Linda Singer, Acting Attorney General at the time, and Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.

Jeffrey A. Taylor, United States Attorney at the time, and Roy W. McLeese III, Assistant United States Attorney, filed a brief at the request of the court.

Joan S. Meier filed a brief for Amici Curiae Domestic Violence Legal Empowerment and Appeals Project (DV LEAP), AYUDA, Break the Cycle, D.C. Coalition Against Domestic Violence, and Women Empowered Against Violence (WEAVE), in support of appellee.

Before REID,* Associate Judge, Retired, and FARRELL,** and KERN, Senior Judges.

REID, Associate Judge, Retired:

This case was initiated by a motion to adjudicate criminal contempt, filed against appellant John Robertson by the Office of the Corporation Counsel for the District of Columbia[1] on behalf of Wykenna Watson. The contempt proceeding resulted from Mr. Robertson's alleged violation of a civil protection order ("CPO") issued by the Family Division of the Superior Court. After a bench trial, the trial court convicted Mr. Robertson on three counts of criminal contempt. He filed both a

---

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

** Judge Farrell was an Associate Judge of the court at the time of argument. His status change to Senior Judge on January 23, 2009.

1. The Office of the Corporation Counsel is now called the Office of the Attorney General for the District of Columbia ("OAG"). We use OAG throughout the opinion even though the old name of the office was in effect during part of these proceedings.

direct appeal (No. 00–FM–925) and a collateral appeal (No. 04–FM–1269). In his collateral appeal, he contends that the trial court (1) violated his due process right by failing to vacate his contempt conviction in light of his plea agreement with the United States Attorney's Office for the District of Columbia ("United States Attorney's Office"); and (2) erred by failing to find that his trial counsel rendered ineffective assistance of counsel when he did not move to dismiss the criminal contempt proceeding on the basis of the plea agreement. In his direct appeal, Mr. Robertson claims that the trial court erred by (1) misapplying the law of self-defense with respect to one count of his criminal contempt conviction; and (2) rejecting his demand for a jury trial.

Following oral argument relating to these consolidated appeals, we invited the United States Attorney for the District of Columbia to file a brief pertaining to three questions about Mr. Robertson's plea agreement with the United States Attorney's Office and his criminal contempt proceeding in the trial court,[2] and we requested responses to the government's brief from Mr. Robertson and Ms. Watson.[3]

In response to this court's questions, Mr. Robertson argued that the United States, not Ms. Watson, was "the true party-in-interest to the contempt proceeding" and that, under D.C.Code § 16–1005(f), the action against him "was maintained 'in the name of the relevant sovereign ... the United States.' " He further contended that the criminal contempt prosecution breached his plea agreement with the United States. In contrast, the United States took the position that Mr. Robertson's criminal contempt prosecution "was conducted as a private action brought in the name and interest of [Ms.] Watson, not as a public action brought in the name and interest of the United States or any other governmental entity." The United States maintained that the criminal contempt proceeding was between Ms. Watson and Mr. Robertson, with OAG "acting in a representative capacity on [Ms.] Watson's behalf, not on behalf of the United States government, the District of Columbia government, or any other governmental entity." Therefore, the United States argued, Mr. Robertson's plea agreement with the United States did not bar the criminal contempt proceeding against him. The District government asserted that "in addition to criminal charges filed by the United States Attorney, Ms. Watson had a right to enforce the CPO through a criminal contempt proceeding and the United States Attorney's Office had no authority to bargain away this right."

Our initial decision in this case generally followed the arguments of the United States and the District of Columbia with respect to the prosecution of the criminal contempt proceeding and the impact of Mr. Robertson's plea agreement on that

---

**2.** The questions were: (1) Do the laws by which the District of Columbia government is bound require all criminal contempt prosecutions in the Superior Court to be maintained in the name of the United States? (2) Is a criminal contempt proceeding, brought under D.C.Code § 16–1005(f) designed to enforce the interests of the United States government, the District of Columbia government, the court which issued the pertinent CPO, or the private party who obtained the CPO? (3) Is the District of Columbia government, or the person who obtained the CPO (and his or her representative) bound by a plea agreement between the United States and a defendant (later a contemnor) in which the United States promises not to pursue or proceed on any other charges against that individual in exchange for a guilty plea to a specified criminal offense?

**3.** We granted the request of several public interest groups to file an amicus brief in support of Ms. Watson.

proceeding. *In re John Robertson*, 940 A.2d 1050 (D.C.2008) (*Robertson I* ). After the publication of our decision, Mr. Robertson filed a petition for rehearing or rehearing en banc which was opposed by the United States and the District. This court denied the petition and Mr. Robertson filed a petition for writ of certiorari in the Supreme Court of the United States on September 10, 2008. The Court granted the petition for writ of certiorari but limited it to one question.[4]

During oral argument the Supreme Court heard from counsel for Mr. Robertson and Ms. Watson, as well as the Solicitor General of the United States.[5] On May 24, 2010, the Court dismissed the writ of certiorari as improvidently granted. However, after noting the complexity of the case, four dissenting justices[6] focused on the limited question posed in granting Mr. Robertson's petition for writ of certiorari, and they declared that the answer "is no": A criminal contempt prosecution in a congressionally created court may not be brought in the name and pursuant to the power of a private person, rather than in the name and pursuant to the power of the United States. *Robertson v. United States ex rel. Watson*, — U.S. —, 130 S.Ct. 2184, 2185, 176 L.Ed.2d 1024 (2010) (ROBERTS, *Chief Justice*, dissenting).

Following the dismissal of the writ of certiorari by the Supreme Court, Mr. Robertson filed in this court a motion to recall the mandate and for rehearing or rehearing en banc, which Ms. Watson opposed.[7] The panel in *Robertson I* decided to grant rehearing and on September 21, 2010, we requested supplemental briefing by the parties.[8]

For the reasons stated below, we now hold that (1) the criminal contempt action, initiated in the Superior Court, an Article I court under the Constitution of the United States, by the OAG on behalf of Ms. Watson, had to be brought in the name and pursuant to the sovereign power of the United States; and (2) D.C.Code § 16–1005(f) and D.C.Code § 23–101 allowed Ms. Watson, assisted by the OAG, to initiate a criminal contempt action involving an

4. The question was: "Whether an action for criminal contempt in a congressionally created court may constitutionally be brought in the name and pursuant to the power of a private person, rather than in the name and pursuant to the power of the United States."

5. In the Supreme Court the United States changed its position on the criminal contempt prosecution in the Superior Court.

6. Chief Justice Roberts and Justices Scalia, Kennedy, and Sotomayor.

7. The United States did not oppose a limited recall to amend this court's opinion to deny relief on the ground that Mr. Robertson's "claims were not properly preserved, and [he] cannot make the showings necessary to overcome his procedural defaults." The District of Columbia opposed the motion and petition because Mr. "Robertson's plea agreement . . . could not reasonably be construed to apply to this criminal case."

8. We asked the parties to address three questions: (1) Should this court hold, in keeping with the position of the United States taken in the Supreme Court in this case, that appellant's prosecution for criminal contempt was an exercise of the sovereign power of the United States? (2) Assuming the court were to reach that conclusion, did appellant forfeit his reliance on the plea agreement to challenge his contempt conviction absent a showing of "cause and prejudice"; and, if so, was his trial counsel's failure to move to dismiss the contempt prosecution in light of the agreement ineffective assistance in the circumstances, and thus "cause"? (3) May the terms of a plea agreement by the United States Attorney (or the Attorney General for the District of Columbia) prevent—and reasonably be understood to prevent—the Superior Court from vindicating its authority through a criminal contempt action prosecuted by a CPO holder exercising governmental power?

intrafamily offense in the name of the United States for the purpose of enforcing a Superior Court CPO.

Furthermore, because Mr. Robertson did not raise his plea agreement claim in the trial court during the criminal contempt proceeding, it is subject to the plain error standard. Under that standard it is not "obvious" that Mr. Robertson's plea agreement with the United States Attorney could bar the Superior Court from exercising its inherent authority to enforce its CPO by means of a contempt sanction against Mr. Robertson. We also reject Mr. Robertson's arguments pertaining to ineffective assistance of counsel, self-defense, and his jury trial demand.

## FACTUAL SUMMARY

The record shows that on March 29, 1999, Ms. Watson filed a "Petition and Affidavit For Civil Protection Order" in the Family Division, Domestic Relations Branch, of the Superior Court. She alleged that on March 27, 1999, Mr. Robertson repeatedly pursued and hit her on various parts of her body, including her head and face, with his closed fist; kicked her several times in the head with his heavy work shoes; and threatened to kill her while holding a pocket knife. She suffered a black eye and head injuries. At Ms. Watson's request, the Family Division issued a temporary protection order on March 29, 1999. On April 26, 1999, the OAG entered its appearance on behalf of Ms. Watson in the Family Court, and after a hearing that same day, the Domestic Violence Unit of the Superior Court issued a CPO, effective for twelve months, ordering that Mr. Robertson not assault, threaten, harass, or physically abuse Ms. Watson in any manner; stay away from Ms. Watson's person, home, and workplace; and avoid contacting Ms. Watson in any manner.

On March 29, 1999, Mr. Robertson was charged by complaint in the Superior Court, Criminal Division, with one count of aggravated assault based on the March 27, 1999, incident. On July 8, 1999, a grand jury indicted Mr. Robertson on one count of aggravated assault and two counts of assault with a dangerous weapon. On July 20, 1999, Mr. Robertson entered into a plea agreement with the United States Attorney's Office in which he agreed to plead guilty to one count of felony attempted-aggravated assault related to the March 27, 1999 incident, and in return the United States agreed that it would "not pursue any charges concerning an incident on June 26, [19]99."

On January 28, 2000, Ms. Watson, assisted by OAG, filed a motion to adjudicate Mr. Robertson in criminal contempt for violations of the CPO, based on incidents between Mr. Robertson and Ms. Watson on June 26 and 27, 1999. She also made a motion to modify and extend the CPO. To support her motion to adjudicate contempt, Ms. Watson submitted an affidavit stating, in part, that (1) on June 26, Mr. Robertson "harassed [her] by repeatedly demanding that [she] drop the criminal charges that were pending against him," and he called her names (Count 1); (2) on June 26, Mr. Robertson "pushed [her] and knocked [her] into a wall" and called her names (Count 2); (3) on June 26/27, around midnight, Mr. Robertson harassed her by repeatedly cursing her (Count 3); (4) on June 26/27, after midnight, Mr. Robertson "physically attacked [her] in the living room," and followed her into the bathroom where he "repeatedly punched [her] in the head and face" (Count 4); (5) and on June 27, a short time after the living room and bathroom incident, Mr. Robertson "threw drain cleaner at [her]" and caused "lye burns" resulting in her hospitalization in an intensive care unit

(Count 5). During a status hearing on April 4, 2000, the parties agreed to extend the CPO, which had been modified by consent on January 31, 2000, until May 30, 2000.

Mr. Robertson filed a demand for a jury trial on April 3, 2000, which Ms. Watson opposed. On May 9, 2000, the Family Court entered an order rejecting Mr. Robertson's jury trial demand and proceeded on May 10 and 11, 2000, with a bench trial to resolve the motion to adjudicate criminal contempt and the motion to modify and extend the CPO. After hearing testimony from Ms. Watson and her mother, Jacqueline Watson, and from defense witness, Vallace Player, and crediting that of Ms. Watson with respect to the first and second counts, the trial judge found beyond a reasonable doubt that Mr. Robertson "harassed Ms. Watson [on June 26, 1999] by making his request that she drop criminal charges and calling her names and ... by pushing her into a wall [Counts 1 and 2]." The court determined that "[i]n doing those acts he violated willfully the [CPO]." With respect to Counts 3 and 4, the trial court credited the testimony of Ms. Player that all three persons in the house that night "were cursing and behaving in ... an abominable fashion," and that Ms. Watson was the instigator of the fight because she taunted Mr. Robertson, opened a can of Drano over which Mr. Robertson and Ms. Watson fought and bit each other. The court found Mr. Robertson not guilty of Counts 3 and 4. As for the final count, Count 5, "the throwing of the lye," the trial court credited Ms. Player's testimony. After it was clear that Mr. Robertson "had won the fight convincingly," and "Ms. Watson was down on the ground bleeding badly," Ms. Player asked Mr. Robertson to leave. The trial court found that Mr. Robertson "had ten seconds to get away," but "[i]nstead [Mr. Robertson] stayed there, [ ] had the lye in [his] hand and ... threw it on [Ms. Watson]." The court determined that Mr. Robertson's assault in throwing the lye at that point was not "any kind of self-defense." Consequently the court adjudged him guilty of Count 5.

Following the trial court's finding on May 11, 2000, that Mr. Robertson was guilty of three counts, the trial judge sentenced him to three consecutive 180–day jail terms, with execution of one of those sentences suspended in favor of five years of probation. The court also ordered Mr. Robertson to pay $10,009.23 in restitution for medical expenses incurred by Ms. Watson which were paid from the Victims of Crime Compensation Fund. Mr. Robertson filed a timely appeal.

Years later, on November 13, 2003, Mr. Robertson filed a motion, pursuant to D.C.Code § 23–110, to vacate his contempt conviction on the grounds that the contempt proceeding violated his July 28, 2000 plea agreement with the United States.[9] He further argued that his conviction should be vacated because "his trial counsel was ineffective in failing to ... move to dismiss the [contempt charges], when the government was pursuing criminal charges in violation of a binding plea agreement." Ms. Watson filed an opposition to the motion on January 23, 2004. In an order signed on August 27, 2004, the trial court denied Mr. Robertson's motion to vacate the conviction, (1) "find[ing] that the plea agreement ... is binding only on the government and not on any party seeking to vindicate a right against the respondent arising from the events of June 26, 1999"; and (2) "conclud[ing] that the [OAG] is not

9. Along with the motion to vacate Mr. Robertson filed a request with the Court of Appeals to stay the briefing schedule in the appellate case, pending resolution of the November 13, 2003 motion by the trial court.

acting as a prosecutor but more as an 'aid' to the petitioner," and that "the private practitioner is therefore not bound by a plea agreement entered into by government prosecutors in another case." Mr. Robertson filed a timely appeal.

## ANALYSIS

■ As a prelude to his primary contention, Mr. Robertson argues that his "prosecution for criminal contempt was an exercise of the sovereign power of the United States." Ms. Watson contends that we need not address the "abstract" [10] "sovereign power" issue because it is irrelevant since Mr. Robertson "forfeited his plea agreement claim by not raising it at trial, and he cannot establish the 'cause' and 'prejudice' necessary to excuse his failure to do so." The United States "agrees that [Mr. Robertson's] prosecution for criminal contempt was an exercise of sovereign power" but maintains that we "need not decide that question to resolve this case." [11] Similarly, the District asserts

that because of Mr. Robertson's procedural defaults, we "need not, and should not, reach the issue whether [Mr. Robertson's] prosecution for criminal contempt was an exercise of the sovereign power of the United States." [12]

Although Ms. Watson, the United States, and the District maintain that we need not address the issue on which only four justices of the Supreme Court commented, and even though the outcome of this case is not dependent on the resolution of that issue, we believe that the better course is to correct the assertion in our original opinion that the criminal contempt action against Mr. Robertson was conducted in the name and pursuant to the power of a private person, Ms. Watson.

■ We turn now to the law governing that preliminary issue. D.C.Code § 16–1005(f) and Super. Ct. Dom. V.R. 12(d) authorize an individual to file a motion to adjudicate criminal contempt in an intrafamily matter.[13] Section 16–1005(f), under

**10.** The Solicitor General of the United States used the word "abstract" in her amicus brief in the Supreme Court, which stated, in part: "[T]he due process issue that [Mr. Robertson] does raise—whether a private prosecutor in a contempt action in fact exercises governmental *power*—arises in an abstract and artificial context."

**11.** The United States points out that Mr. Robertson "did not raise his plea-breach claim until he filed a post-conviction motion under D.C.Code § 23–110."

**12.** The District reiterates a statement made in its amicus brief in the Supreme Court: "The District of Columbia agrees with [Ms.] [Watson] that the Constitution allowed her to bring this criminal contempt proceeding in her own name." Amici take the position that "the United States' new position and Justice Robert's dissent notwithstanding, ... permitting private litigants to bring enforcement actions on their own behalf[ ] in their own CPO cases, whether the sanctions issued by the court are labeled 'criminal' or 'civil' con-

tempt, or more accurately, 'enforcement sanctions,' remains both constitutional and sound policy."

**13.** D.C.Code §§ 16–1005(f) and (g) (2001) currently provide:

(f) Violation of any temporary or final order issued under this subchapter, or violation in the District of Columbia of any valid foreign protection order, as that term is defined in subchapter IV of this chapter, and respondent's failure to appear as required by § 16–1004(b), shall be punishable as contempt. Upon conviction, criminal contempt shall be punished by a fine not exceeding $1,000 or imprisonment for not more than 180 days, or both.

(g) Any person who violates any protection order issued under this subchapter, or any person who violates in the District of Columbia any valid foreign protection order, as that term is defined in subchapter IV of this chapter, shall be chargeable with a misdemeanor and upon conviction shall be punished by a fine not exceeding $1,000

which the contempt action in this case was initiated, is a penal statute which addresses a public wrong as opposed to a remedial statute that compensates a civil injury. *See Huntington v. Attrill,* 146 U.S. 657, 668–69, 13 S.Ct. 224, 36 L.Ed. 1123 (1892) (distinguishing between private wrongs and public wrongs); *United States v. Dixon,* 509 U.S. 688, 699, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) ("the legislature was the ultimate source of both the criminal and the contempt prohibition"); *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) ("Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both.").

■■■ The prosecution of penal laws or criminal statutes in the District of Columbia is controlled by D.C.Code § 23–101.[14] Criminal contempt actions relating to intrafamily offenses fall under § 23–101(c), and hence, "shall be conducted in the name of the United States by the United States attorney for the District of Columbia or its assistants, except as otherwise provided by law." Read together, D.C.Code § 16–1005(f) and D.C.Code § 23–101 permit Ms.

---

or by imprisonment for not more than 180 days, or both.

Super. Ct. Dom. V.R. 12(d) specifies, in pertinent part:

(d) Motion to adjudicate criminal contempt. A motion requesting that the court order a person to show cause why she/he should not be held in criminal contempt for violation of a temporary protection order or civil protection order may be filed by an individual, Corporation Counsel or an attorney appointed by the Court for that purpose....

14. D.C.Code § 23–101 (2001) provides:

(a) Prosecutions for violations of all police or municipal ordinances or regulations and for violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year, shall be conducted in the name of the District of Columbia by the Corporation Counsel for the District of Columbia or his assistants, except as otherwise provided in such ordinance, regulation, or statute, or in this section.

(b) Prosecutions for violations of section 6 of the Act of July 29, 1892 (D.C. Official Code, sec. 22–1307), relating to disorderly conduct, and for violations of section 9 of that Act (D.C. Official Code, sec. 22–1312), relating to lewd, indecent, or obscene acts, shall be conducted in the name of the District of Columbia by the Corporation Counsel or his assistants.

(c) All other criminal prosecutions shall be conducted in the name of the United States by the United States attorney for the District of Columbia or his assistants, except as otherwise provided by law.

(d) An indictment or information brought in the name of the United States may include, in addition to offenses prosecutable by the United States, offenses prosecutable by the District of Columbia, and such prosecution may be conducted either solely by the Corporation Counsel or his assistants or solely by the United States attorney or his assistants if the other prosecuting authority consents.

(e) Separate indictments or informations, or both, charging offenses prosecutable by the District of Columbia and by the United States may be joined for trial if the offenses charged therein could have been joined in the same indictment. Such prosecution may be conducted either solely by the Corporation Counsel or his assistants or solely by the United States attorney or his assistants if the other prosecuting authority consents.

(f) If in any case any question shall arise as to whether, under this section, the prosecution should be conducted by the Corporation Counsel or by the United States attorney, the presiding judge shall forthwith, either on his own motion or upon suggestion of the Corporation Counsel or the United States attorney, certify the case to the District of Columbia Court of Appeals, which court shall hear and determine the question in a summary way. In every such case the defendant or defendants shall have the right to be heard in the District of Columbia Court of Appeals. The decision of such court shall be final.

Watson, assisted by the OAG, to initiate a criminal contempt action involving intrafamily offenses in the name of the United States for the purpose of enforcing a Superior Court CPO. We considered criminal contempt and CPO statutory and regulatory provisions, including D.C.Code § 16–1005(f), in *Green v. Green,* 642 A.2d 1275 (D.C.1994) and declared: "Those provisions reflect a determination by the Council [of the District of Columbia] that the beneficiary of a CPO should be permitted to enforce that order through an intrafamily contempt proceeding." *Id.* at 1279. Thus, so long as the beneficiary's CPO enforcement action is brought in the name of the United States, we discern no statutory impediment.[15] Nor does it matter that the contempt action here was not actually captioned in the name of the sovereign, when Mr. Robertson could have had no doubt that the action was being brought as an exercise of the court's authority to vindicate its order. As the Supreme Court has made clear, what matters is the "substance of the proceeding and the character of the relief," rather than the label that the state or the parties have placed on the action. *Hicks ex rel. Feiock v. Feiock,* 485

U.S. 624, 631, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988).

We focus now on Mr. Robertson's main argument that his plea agreement with the United States Attorney barred the criminal contempt action against him. He did not present this claim in the trial court during his criminal contempt proceeding; rather, he filed it in 2003, more than three years after his contempt conviction. Therefore, we review it under the plain error standard.[16] "[T]he legal error [under that standard] must be clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States,* —— U.S. ——, 129 S.Ct. 1423, 1429, 173 L.Ed.2d 266 (2009) (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

It is not obvious that a plea agreement or a contract between Mr. Robertson and the United States Attorney can preclude the Superior Court from vindicating its authority. Criminal and punitive contempt proceedings are designed "to preserve the power, and vindicate the dignity of the courts, and to punish for disobedience of their orders...." *Bessette*

15. Upon reflection, and in contrast to our reading of *Green* in *Robertson I,* we believe that the reference in *Green* to "a private right of action to seek a CPO" and "a private right of action to enforce the CPO through an intrafamily contempt proceeding," 642 A.2d at 1279 n. 7, does not mean that the beneficiary of a CPO may initiate a CPO enforcement action (criminal contempt action) in her own name rather than in the name of the United States. In fact, footnote 7 does not mention in whose name the criminal contempt action may be brought.

16. Ms. Watson contends that Mr. Robertson "must establish 'cause' and 'prejudice' for failing to raise the issue earlier" and maintains that "[h]e cannot meet this demanding standard." The general rule is that "[w]here a defendant has failed to raise an available challenge to his conviction on direct appeal,

he may not raise that issue on collateral attack unless he shows both cause for his failure to do so and prejudice as a result of his failure." *Washington v. United States,* 834 A.2d 899, 902 (D.C.2003) (internal quotation marks and citations omitted). However, we also have said that "[w]hen an appellant presents an issue which he did not raise in the trial court, we review, if at all, for plain error, whether the alleged error is non-constitutional or constitutional in nature." *Lowery v. United States,* 3 A.3d 1169, 1172 (D.C.2010) (footnote and citations omitted). We think it unnecessary to decide whether the stricter standards of "cause" and "prejudice" apply since Mr. Robertson did raise the plea agreement issue in the trial court, albeit belatedly; moreover, although he did so in a collateral attack, this took place during the pendency of his direct appeal.

*v. W.B. Conkey Co.*, 194 U.S. 324, 328, 24 S.Ct. 665, 48 L.Ed. 997 (1904); *see also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 800, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (Criminal contempt actions "serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings.") (footnote omitted). Indeed, the Court held in *Young* that the prosecution of criminal contempt in Article III courts need not "be considered an execution of the criminal law in which only the Executive Branch may engage." *Id.* at 823, 107 S.Ct. 2124 (internal quotation marks and citation omitted). It based this conclusion on "the longstanding acknowledgment that the initiation of contempt proceedings to punish disobedience to court orders is a part of the judicial function" and on the Judiciary's "need for an independent means of self-protection." *Id.* at 795, 796, 107 S.Ct. 2124. Thus, provided that prosecution for criminal contempt in a congressionally created court such as the Superior Court is understood as an exercise of sovereign power, it is by no means evident—absent a double jeopardy bar not present here—that a plea agreement by the Executive can tie the hands of a Superior Court judge so as to preclude vindication of that court's authority by an order of contempt.

■ Moreover, "a plea agreement is a contract." *United States v. Jones*, 313 U.S.App.D.C. 128, 131, 58 F.3d 688, 691 (1995) (citation omitted). "As a conse-

quence, courts will look to principles of contract law to determine whether the plea agreement has been breached." *Id.* (citations omitted). The plea agreement in this case was signed only by Mr. Robertson, his attorney, and an Assistant United States Attorney. The pertinent handwritten narrative stated: "In exchange for Mr. Robert[son's] plea of guilty to Attem[pted] Aggravated Assault, the gov't agrees ... not [to] pursue any charges concerning an incident on 6–26–99." The abbreviated word "gov't" clearly referred only to the United States, and hence, only the United States and Mr. Robertson were bound by the agreement.

■ While Mr. Robertson may have expected that his plea agreement with the government would prevent him from being charged with anything else related to his actions on June 26, 1999, "[a] defendant's subjective expectations as to how a plea agreement will redound to his benefit are enforceable, if at all, only to the extent that they are objectively reasonable." *United States v. Garcia*, 954 F.2d 12, 17 (1st Cir.1992) (citations omitted). It is not objectively reasonable for a violator of a CPO to expect that his plea agreement with the United States would shield him by taking away the inherent power and authority of the Superior Court to enforce its CPOs through the sanction of criminal contempt. Nor is it "obvious" that Mr. Robertson's plea agreement bargained away the inherent authority of a Superior Court judge to sanction him for criminal contempt.[17] *Olano, supra*, 507 U.S. at 734, 113 S.Ct. 1770.

---

**17.** Nor can we agree with Mr. Robertson's assertion that his "trial counsel was ineffective in failing to file a motion to dismiss based upon the plea breach claim." The claim that Mr. Robertson's plea agreement could take away inherent authority of the trial court is indeed novel and, as the government states:

"[N]umerous state and federal courts have concluded that counsel's failure to advance novel legal theories or arguments does not constitute ineffective performance [of counsel]." *Ledbetter v. Commissioner of Corr.*, 275 Conn. 451, 880 A.2d 160, 167 (2005) (citing cases).

### Mr. Robertson's Other Arguments

We dispose of Mr. Robertson's other arguments summarily. Mr. Robertson argues that the "Family Court committed error in denying [his] demand for a jury trial," because, "although D.C.Code § 16–1005(f) sets forth a maximum period of incarceration of 180 days, the $10,000 restitution penalty imposed on [him], viewed in tandem with this maximum period of incarceration and the five-year maximum period of probation, undoubtedly served to remove this case from the category of 'petty' offense." The record shows that in filing her motion to modify and extend civil protection order, apparently simultaneously with her motion to adjudicate contempt, Ms. Watson demanded payment for her medical bills (around $10,000) resulting from the burns caused by Mr. Robertson when he threw lye at her. Because of this demand, which Mr. Robertson interpreted, in part, as an effort to obtain personal injury damages, he argued that he was entitled to a jury trial under both the Sixth and Seventh Amendments to the Constitution. The trial court denied his jury demand.[18]

In *Olafisoye v. United States*, 857 A.2d 1078 (D.C.2004), we reiterated the principle that "while federal and state courts must provide jury trials for all 'serious crimes,' trials for offenses that are regarded as 'petty' do not require the same treatment." *Id.* at 1083 (citing *Dun-*

*can v. Louisiana*, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)). Moreover, "[t]he factor that distinguishes a serious offense from a petty offense is the 'maximum authorized period of incarceration.'" *Id.* (quoting *Blanton v. City of North Las Vegas*, 489 U.S. 538, 541–42, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989)). "*Blanton* established a presumption that crimes punishable by incarceration of six months or less were not deemed serious for jury trial purposes." *Id.* (footnote omitted) (citing *Blanton*, 489 U.S. at 542–43, 109 S.Ct. 1289; *Day v. United States*, 682 A.2d 1125, 1128 (D.C.1996)). On this record, where the maximum statutory penalty is a fine not exceeding $1,000, or a period of incarceration up to 180 days, and where the $10,000 payment was earmarked as *restitution or reimbursement for Ms. Watson's medical expenses* paid by the Victims of Crime Compensation Fund, we conclude that Mr. Robertson was not constitutionally entitled to a jury trial; under *Olafisoye* and *Blanton, supra*, his offense is classified as "petty" rather than "serious." *Cf. Nebraska v. Clapper*, 273 Neb. 750, 732 N.W.2d 657, 662–63 (2007) (no violation of Sixth Amendment where court ordered defendant to pay $18,862.72 in restitution to victim for medical expenses; "a judge's factfinding for restitution does not result in a sentence that exceeds a statutory maximum"); *United States v. Milkiewicz*, 470 F.3d 390, 403 n. 24 (1st

---

18. There is some confusion in the record as to whether the $10,000 restitution requirement for medical bills (payable to the Victims of Crime Compensation Fund) was imposed as part of Mr. Robertson's sentence, or as part of the modification of the CPO. At the June 14, 2000 hearing where the trial court imposed sentence and extended and modified the CPO, the trial court stated that it was suspending execution of the incarceration penalty "and putting [Mr. Robertson] on a five year period of probation with the condition that [he] pay $10,000 in restitution." A few minutes later

the trial court "move[d] on to the [CPO]" and there also was a reference to restitution and the $10,000 payment. Before the trial court imposed sentence, counsel for Ms. Watson stated that they had "formally asked for the restitution in the modified and extended [CPO]," but that "whether it be done through the contempt proceeding or through the modification of the [CPO], they did think that a restitution is appropriate [and] that total came to just over $10,000...." Mr. Robertson does not press his Seventh Amendment contention in this court.

Cir.2006) ("Although restitution is 'criminal' in many senses, ... we note that some courts have concluded that restitution is not the sort of 'punishment' to which the Sixth Amendment applies") (citations omitted); *United States v. Leahy*, 438 F.3d 328, 337 (3d Cir.2006) ("restitution order does not punish a defendant beyond the 'statutory maximum' as that term has evolved in the Supreme Court's Sixth Amendment jurisprudence") (citations omitted); *see also United States v. Nachtigal*, 507 U.S. 1, 5, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) (sentence which included five years of probation was not an infringement on liberty that required a jury trial under the Sixth Amendment).

 Finally, Mr. Robertson asserts that the trial court "misapplied the law of self-defense." The trial court essentially found that after "Mr. Robertson had won the fight [with Ms. Watson] convincingly, Ms. Watson was down on the ground bleeding badly." At Ms. Player's request, Mr. Robertson left her house, but remained on the premises instead of walking away. The trial court credited Ms. Player's testimony and found that Mr. Robertson "had ten seconds to get away," but remained there with lye in his hands and "threw it on [Ms. Watson]." Case law in this jurisdiction holds that "[w]hen a defendant raises a claim of self-defense, the trial court must decide, as a matter of law, whether there is record evidence sufficient to support the claim." *Howard v. United States*, 656 A.2d 1106, 1111 (D.C.1995) (citation omitted). The trial court here was the factfinder in adjudicating Mr. Robertson's self-defense claim, and she applied correct legal standards in rejecting it. "[S]elf-defense may not be claimed by one who deliberately places himself ... in a position where he ... has reason to believe his ... presence ... would provoke trouble." *Id.* (citations and internal quota-

tion marks omitted). What we said in *Gillis v. United States*, 400 A.2d 311 (D.C. 1979) supports the trial court's rejection of Mr. Robertson's self-defense claim with respect to Count 5 of the charges against him:

> [The] middle ground between the two extremes [of] the right to stand and kill, and the duty to retreat to the wall before [k]illing[, ...] imposes no duty to retreat.... But this middle ground does permit [the fact finder] to consider whether a defendant, if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm. In short, this rule permits the [fact finder] to determine if the defendant acted too hastily, was too quick to pull the trigger. A due regard for the value of human life calls for some degree of restraint before inflicting serious or mortal injury upon another.

*Id.* at 313. Given the trial court's credibility determination and its factual findings, we see no reason to disturb its rejection of Mr. Robertson's claim to self-defense.

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court in Appeal No. 00–FM–925 and Appeal No. 04–FM–1269.

*So ordered.*