*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CF-0982

MARK STUBBLEFIELD, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF3-006837)

(Hon. Jason Park, Trial Judge)

(Submitted December 19, 2024                    Decided June 26, 2025)

*Nancy E. Allen* was on the brief for appellant.

*Amanda Claire Hoover*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time of submission, and *Chrisellen R. Kolb*, *Carlos Valdivia*, and *Alec Levy*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

Opinion for the court by *Associate Judge* DEAHL.

Opinion concurring in the judgment in part and dissenting in part by *Associate Judge* MCLEESE at page 27.

DEAHL, *Associate Judge*: Mark Stubblefield was charged with multiple

offenses stemming from two separate robberies—the first at a Truist Bank in

October 2022, and the second at a People's Bank in November 2022. Stubblefield went to trial on the counts stemming from the October robbery: armed robbery and threats to injure or kidnap. After a jury found him guilty of both offenses, Stubblefield pled guilty to one count of robbery in connection with the November incident.

Stubblefield now appeals his armed robbery conviction in connection with the October robbery. He argues that there was insufficient evidence to conclude that he was armed with a "dangerous or deadly weapon" during the October robbery; though he told the tellers he had a bomb, no witness saw a bomb, no bomb was ever recovered, and the evidence did not prove that the tellers actually believed he had a bomb. D.C. Code § 22-4502(a). The government counters that Stubblefield waived his right to appeal any of his convictions when he entered a post-trial guilty plea to the November offense. On the merits, the government argues that it did not need to prove that Stubblefield was in fact armed with a bomb, though it suggests that its evidence sufficed to prove that anyhow. More forcefully, the government argues that Stubblefield intentionally created a reasonable belief in his victims that he was armed with a bomb during the robbery, which the government argues is sufficient to sustain the robbery while armed conviction. We conclude that Stubblefield did not waive his right to this appeal and that the evidence was insufficient to establish that he was armed with a dangerous weapon because the government did not prove that

Stubblefield was actually armed with a bomb, nor did it prove that his victims subjectively believed that he had a bomb. We therefore reverse Stubblefield's armed robbery conviction and remand for entry of its lesser included robbery conviction as to that offense.

## I. Factual Background

The evidence is largely undisputed, and we recount it with a focus on Stubblefield's challenge to whether the evidence was sufficient to conclude that he was armed with a bomb during the October robbery.

At Stubblefield's trial for the October offenses, the government presented testimony from two bank tellers—Ronece Turner and Mason Sash—to establish that Stubblefield robbed a Truist Bank branch while claiming to have a bomb. Surveillance footage showed Stubblefield entering a Truist Bank branch and approaching the teller station, where Turner and Sash were counting a large sum of cash. According to Sash, Stubblefield then instructed Turner to "slide [the cash] under" the glass partition, but neither teller reacted until the robber said "he ha[d] a bomb, and [was] going to blow this place up." Both Turner and Sash then hit a silent alarm that notifies Truist's security when a robbery is underway, and Turner handed over $10,000 in cash. Turner explained that she was "terrified" and in "fear[] for [her] life," and she complied with Stubblefield's demands so that "he could leave as

soon as possible." Sash testified to feeling "insane adrenaline" and "definitely a little bit scared." Stubblefield evaded capture for a time—he was not arrested until about a month later, after a second bank robbery in November—and no bomb was ever found.

Although neither teller saw anything resembling a bomb, Turner testified that the robber "pointed into [his] bag" when he said he had a bomb, as if to indicate "[t]hat the bomb was in the bag." Turner thought "there was *a possibility* [the robber] had a bomb" "based on what [he] said and his gestures." But she was never asked by the government or defense counsel whether she believed the robber in fact had a bomb. Sash testified similarly. He opined that there was "definitely a possibility" that the robber had a bomb, so he thought it best to "just comply" with the robber's demands. As with Turner, the government never asked Sash pointedly whether he actually believed "the robber had a bomb." But defense counsel asked that pointed question in cross-examination, and Sash responded in the negative: "I guess I didn't [think that the robber had a bomb]," though he "might" have.

The trial court instructed the jury on the elements of robbery while armed. Relevant here, it told jurors that Stubblefield was armed with a dangerous weapon so long as he used an object "in a manner that is intended to lead the complainant

reasonably to believe that it is an object that would cause death or serious bodily injury."

The jury found Stubblefield guilty of armed robbery and threats stemming from that October incident. Stubblefield then pled guilty to one count of robbery in connection with a November robbery of a People's Bank. In relevant part, the plea agreement provided that Stubblefield would "waive, insofar as such waiver is permitted by law, the right to direct appeal the convictions in this case," though it did not specify if "this case" included the October charges that he had already stood trial on. At the in-court plea colloquy, the court confirmed that Stubblefield had reviewed the plea agreement with his attorney and understood that he was giving up several rights, including his right to appeal, but as with the plea agreement, the colloquy did not specify which convictions that waiver would apply to.

The trial court sentenced Stubblefield to concurrent terms of imprisonment of (1) fifteen years for the October armed robbery offense, (2) fifteen years for the November robbery offense, and (3) twenty-two months for the October threats offense. At the sentencing hearing, the trial court advised Stubblefield, without objection from the government, that he had a right to "appeal . . . those convictions that resulted in a jury trial conviction." Stubblefield now appeals, challenging only the "while armed" aspect of his October robbery conviction.

## II. Analysis

Stubblefield argues on appeal that the evidence was insufficient to conclude that he committed an armed robbery. More specifically, he argues that there was not evidence from which one could conclude beyond a reasonable doubt that he was in fact armed with a bomb, or that the tellers reasonably and subjectively believed that he was armed with a bomb, when he robbed the Truist bank. The government responds that (1) Stubblefield waived his appellate rights in his post-trial plea agreement so that we should dismiss this appeal, and (2) in the alternative, the evidence was sufficient to find that Stubblefield was actually armed or that his actions instilled a reasonable belief in the tellers that he was. We address those points in turn.

*A. Stubblefield Did Not Clearly Waive His Right to Appeal the Earlier Convictions*

Stubblefield and the government disagree about whether he waived his right to appeal his convictions stemming from the October robbery when, after standing trial for the charges stemming from that incident, he entered a guilty plea resolving the charges stemming from the November incident. Their dispute reduces to what the plea agreement means when it says that Stubblefield waives his "right to direct appeal the convictions *in this case*." (emphasis added). The government contends that "this case" captures all of the offenses, stemming from both the October and the

November incidents, given that the offenses were all charged as part of one unified indictment, even though the offenses were later severed before trial. Stubblefield counters that he only waived his right to appeal the conviction that he pled guilty to, i.e., the conviction from the November robbery.

"[A] plea agreement is a contract," so we "look to principles of contract law to determine" the meaning of its terms and whether there has been a breach. *In re Robertson*, 19 A.3d 751, 761 (D.C. 2011) (quoting *United States v. Jones*, 58 F.3d 688, 691 (D.C. Cir. 1995)). Ordinarily, we will enforce a plea agreement, including an appellate waiver, so long as the defendant agreed to it "voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences." *Hilliard v. United States*, 879 A.2d 669, 671 (D.C. 2005) (quoting *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)). Critically in this case, we construe "any ambiguity" in a plea agreement "against the government." *Stedman v. District of Columbia*, 12 A.3d 1156, 1158 (D.C. 2011) (quoting *White v. United States*, 425 A.2d 616, 618 (D.C. 1980)); *Louis v. United States*, 862 A.2d 925, 928 (D.C. 2004) ("This court construes any ambiguity [in a plea agreement] against the government."); *see also United States v. Jackson*, 26 F.4th 994, 999-1000 (D.C. Cir. 2022) (Because "[a]n ambiguous appeal waiver cannot be knowingly, intelligently, and voluntarily agreed to," courts "will not bar the door to a criminal defendant's

appeal if his waiver only arguably or ambiguously forecloses his claims." (quoting *United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016))).

This plea agreement's appellate waiver provision is simply not clear about whether it applies to the October offenses that Stubblefield had already stood trial on, so we must resolve that ambiguity against the government and allow this appeal to proceed. The government has three counterpoints, but none has enough force to render this an unambiguous waiver of Stubblefield's right to appeal the October convictions.

First, the government posits that as a matter of plain language, the phrase "this case" encompasses all counts that were jointly indicted, even though the counts were later severed for trial. While that is certainly one conceivable meaning of the phrase, it is definitely not the only one. It is equally natural, and perhaps more so, to refer to separate groups of offenses that have been severed for separate trials as comprising distinct cases. The transcripts of the plea colloquy potently illustrate the point. As part of the plea agreement, the government agreed to waive sentencing enhancements for the November robbery offense. The trial court clarified that "you're not waiving enhancements *for the other case* . . . right?," and while the government replied that "it's all one case," the trial court rebutted "Oh—for the other—what I caused to become another case." This trend continued later, at the sentencing hearing, when the trial court advised Stubblefield—without correction

from the government—that he had a right to "appeal . . . those convictions that resulted in a jury trial conviction," evincing the trial court's own understanding that Stubblefield's waiver of his appellate rights from "this case" applied only to the November incident.

We find the trial court's persistent references to the severed *cases*, rather than severed charges comprising one unified case, perfectly natural. Like the trial court, this court has also referred to distinct groups of severed charges as separate cases, even when they were jointly indicted. *See, e.g.*, *Pinkney v. United States*, 851 A.2d 479, 483 n.1 (D.C. 2004) ("Curry and appellant were jointly indicted, but *Curry's case* was severed before trial." (emphasis added)); *Banks v. United States*, 237 A.3d 90, 93, 105 (D.C. 2020) (holding trial court erred in denying motion to sever jointly indicted counts related to five separate robberies and remanding for new trials in two of those "cases"); *see also Cox v. United States*, 498 A.2d 231, 234, 237 (D.C. 1985) (referring to "joinder of the two rape cases" that had been jointly indicted). So this point is of little help to the government.

Second, the government stresses that the plea waiver uses the plural form when it states that Stubblefield waives his "right to direct appeal the *convictions* in this case." (emphasis added). Because there was only one conviction stemming from the November incident, the argument goes that the waiver must apply to the

October incident as well, otherwise the word "convictions" was inapt. This point would have far more force if the plea agreement consistently spoke of multiple convictions, but it instead oscillates between the singular and plural form of that word. For example, within the same paragraph detailing the appellate waiver, the agreement reads: "Notwithstanding the above agreement to waive the right to appeal *the conviction* and sentence, [Stubblefield] retains the right to appeal on the basis of ineffective assistance of counsel." (emphasis added). Elsewhere, the appellate waiver paragraph notes that Stubblefield is waiving his right to challenge the convictions he "is pleading guilty" to, and he pled guilty to only one count, with the others being resolved via jury trial. Both of those sentences suggest the appellate waiver applies only to the single conviction stemming from the November offense. To whatever extent use of the plural "convictions" at points counsels in favor of the government's view, there are aspects of the waiver provision that cut just as squarely against it, thus leaving the agreement ambiguous on its face.

Third, the government points out in a footnoted aside that when it transmitted the plea agreement to defense counsel, the text of the prosecutor's email said: "I ask that you please emphasize to your client that he would waive the right to directly appeal the convictions in this case, including convictions arising from the verdict returned by the jury in connection with" the October robbery. That language is clear enough, to be sure, but it does not appear in the plea agreement itself, it was never

made part of the agreement during the in-court colloquy, and there is no evidence that this understanding was ever communicated to Stubblefield. Unsurprisingly then, the government does not develop any argument about the extent to which we should consider that emailed statement to defense counsel, which raises a host of questions about whether we can look to extrinsic evidence when interpreting an ambiguous plea agreement, whether this gloss on the agreement was ever communicated to Stubblefield, and whether the trial court understood it to be part of the plea agreement that it approved. We therefore disregard the email in the absence of any developed argument from the government about how it might be properly considered as part of our inquiry into the plea agreement's meaning. *See Gabramadhin v. United States*, 137 A.3d 178, 187 (D.C. 2016) (declining to consider argument floated by government in a footnote lacking "specific legal . . . argument").

Because the plea agreement is ambiguous on the point, we conclude that Stubblefield did not waive his right to appeal the October convictions, so we proceed to consider his sufficiency challenge on its merits.

*B. The Evidence Was Insufficient to Prove that Stubblefield Was Armed*

Stubblefield challenges only the sufficiency of the evidence to sustain the "while armed" aspect of his robbery conviction, which is an enhancement that

applies when a defendant commits certain underlying offenses while "armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon." D.C. Code § 22-4502(a); *Hartley v. United States*, 117 A.3d 1035, 1037 (D.C. 2015). It is undisputed, and undoubtable, that a bomb qualifies as a dangerous or deadly weapon under the statute.

We review sufficiency of the evidence claims de novo, "considering 'all the evidence in the light most favorable to the verdict and according deference to the factfinder to weigh the evidence, determine credibility, and draw justifiable inferences of fact.'" *Alleyne v. United States*, 327 A.3d 472, 479 (D.C. 2024) (quoting *Wicks v. United States*, 226 A.3d 743, 746-47 (D.C. 2020)). Under this deferential standard of review, we will uphold a conviction if the evidence is sufficient to permit "*any* rational trier of fact" to find "the essential elements of the charged offense beyond a reasonable doubt," though the evidence "need not compel a finding of guilt or negate every possible inference of innocence." *Bassil v. United States*, 147 A.3d 303, 307-08 (D.C. 2016) (first quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc); and then quoting *Rollerson v. United States*, 127 A.3d 1220, 1232 (D.C. 2015)). This review is not "toothless." *Rivas*, 783 A.2d at 134. Evidence will be deemed insufficient to support a conviction "if, in order to convict, 'the factfinder was required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.'" *In re T.B.*, 331

A.3d 242, 248 (D.C. 2025) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)).

As a threshold matter, the parties disagree about whether the government had to prove that Stubblefield in fact had a bomb, as Stubblefield suggests, or if, as the government maintains, it sufficed to show that Stubblefield intentionally acted in a way that successfully instilled a reasonable belief in his victims that he had a bomb.

The government is correct that it needed to prove only that one of the tellers reasonably believed that Stubblefield was armed with a bomb when he committed the robbery. As we have repeatedly held, "any object which the victim perceives to have the apparent ability to produce great bodily harm can be considered a dangerous weapon." *Paris v. United States*, 515 A.2d 199, 204 (D.C. 1986); *see also Harris v. United States*, 333 A.2d 397, 400 (D.C. 1975) ("[P]resent ability of the weapon to inflict great bodily injury is not required to prove an assault with a dangerous weapon. Only apparent ability through the eyes of the victim is required."); *Meredith v. United States*, 343 A.2d 317, 320 (D.C. 1975) (per curiam) (same as to the "while armed" enhancement provision at issue here).[1] While some of this court's

---

[1] At least one of our precedents suggests that this "apparent weapon" rationale does not suffice to sustain convictions of possessory, as opposed to assaultive, offenses like the robbery at issue here. *See Strong v. United States,* 581 A.2d 383, 387 (D.C. 1990) (holding that an inoperable air pistol was not a dangerous weapon for purposes of the "carrying a dangerous weapon" statute, because it "require[s]

judges have contended otherwise and suggested we should reconsider this issue en banc, we as a division of this court are not free to disregard the many binding precedents holding that a person is armed with a dangerous weapon so long as they instill a reasonable and actual belief in a victim that they are. *But see Smith v. United States*, 777 A.2d 801, 813-14 (D.C. 2001) (Farrell, J., concurring) (opining that for the "while armed" enhancement to apply, "the defendant must actually have been armed with or had readily available a firearm (or imitation thereof) or other dangerous weapon; it is not enough that he *appeared to be* armed if in fact he was not"); *Washington v. United States*, 135 A.3d 325, 333 (D.C. 2016) (Washington, C.J., concurring) (describing the same rough issue as one "that should be addressed en banc").

So, to prove Stubblefield was armed with a dangerous weapon, the government was required to establish beyond a reasonable doubt either that (1) he was in fact armed with a bomb, or (2) that one of the tellers reasonably believed he was so armed. We consider those two theories of guilt in turn.

---

that the weapon actually be likely to injure someone," not merely that it would reasonably appear to the victim that it was capable of doing so). This court recently granted en banc review in a pair of cases in part to consider that issue. *See Bagalacsa v. United States*, No. 23-CM-0458, and *Davidson v. United States,* No. 23-CM-0939 (sua sponte en banc review granted on May 20, 2025).

## 1. The Evidence Was Insufficient to Prove that Stubblefield Was Actually Armed

The government first suggests that the evidence was sufficient to prove that Stubblefield was in fact armed with a bomb. We disagree. We note at the outset that the government did not forcefully press the theory at trial that Stubblefield was actually armed with a bomb, and instead relied largely on the theory that he intentionally created a reasonable belief in the tellers that he was armed (even if he was not). That is perhaps why some of the powerful evidence that Stubblefield did not in fact have a bomb never came before the jury—that did not seem to be much of a bone of contention between the parties.[2] To illustrate the point, defense counsel's closing argument stressed that there was "nothing indicating that this particular offense was committed with a bomb," aside from Stubblefield's on-scene claim; for instance, the tellers did not see or hear anything indicative of a bomb in Stubblefield's bag. The government countered in its rebuttal closing, with no

---

[2] The Gerstein affidavit in support of Stubblefield's arrest indicates that Sash thought Stubblefield's bag looked "light" and that it "appeared . . . to be empty" when Stubblefield opened it to take the money. Those statements were never introduced before the jury, so we ignore them in our sufficiency analysis, except to say that the video surveillance footage of Stubblefield robbing the Truist Bank and making his getaway lends some support to those descriptions (though we agree with our dissenting colleague that this visual support is fairly limited). As we elaborate on momentarily, Stubblefield is swinging his bag in a way that suggests it was light and in a more haphazard way than one would naturally expect if—but certainly does not preclude the possibility that—he in fact was carrying a bomb within it.

suggestion that the evidence established that Stubblefield was in fact armed, only by highlighting that defense counsel's argument that "there is not really a bomb" was immaterial because he acted in a "manner that [was] intended to lead the complainant reasonably to believe that" he had a bomb. Still we cannot say that the government entirely abandoned this theory of guilt at trial—and the jury was instructed on this theory in any event—so we consider the sufficiency of the evidence as to it further.

Relying on *Smith*, the government argues that a defendant's contemporaneous threats may be enough to prove he was armed during a crime, at least when he also acted in a manner consistent with being armed. 777 A.2d at 811-12; *see also United States v. Ray*, 21 F.3d 1134, 1141 (D.C. Cir. 1994) (jury could reasonably find defendant had a firearm because he "threat[ened] to blow the teller's head off"). In *Smith*, we found evidence that the defendant told his victims that he had a firearm, that they believed him, and that he acted in a manner "consistent with someone possessing a firearm" during a robbery—i.e., keeping his hand in his jacket pocket while pointing it at the complainants—was sufficient circumstantial evidence to establish that he was at the time armed with a firearm (or imitation thereof). 777 A.2d at 804, 811-13. It is undoubtedly true that, in some circumstances, there will be proof beyond a reasonable doubt that the defendant was in fact armed even where the particular arm is never seen nor recovered. But to apply that reasoning here would stretch *Smith* beyond reason.

*Smith* arose in the context of firearms, which are fairly ubiquitous and relatively easy to obtain. While we view *Smith* as a close case, under the circumstances there, jurors might have reasonably concluded that the assailant who claimed to have a firearm in fact had one. *But see id.* at 813-14 (Farrell, J., concurring) (noting that "it is naturally troublesome when, as in this case, the proof of actual possession consists entirely of evidence that appellant behaved *as though* he was armed with and prepared to use a gun, but no gun was found on him").

A bomb is a different animal. It is far less facially plausible that Stubblefield procured (or manufactured) a bomb than it would be if he had claimed to have more commonplace weapons like a gun or a knife, as the defendant in *Smith* did. We note five reasons in support of that view.

First, and most critically, bombs are far less common than firearms, as jurors undoubtedly know. Second, bombs are an especially high-risk weapon of choice for would-be robbers, who stand a decent chance of harming themselves in the process of creating and carrying a bomb. Third, bombs lack the basic utility of firearms in that they can be deployed only once, whereas a gun can be used to shoot at or toward a non-compliant victim in the hopes of prompting them or another person in the area to comply given the continued threat of another shooting. Fourth, falsely claiming to have a bomb is the better bluff, because while claims of having a hidden firearm

are fairly frequently met with a "let's see it," the threat of a bomb engenders a more panicked reaction with victims unlikely to seek such hard proof. Fifth, while most people can recognize a firearm on sight, on the off chance somebody does ask to see the claimed bomb the assailant might flash just about anything—some road flares, a half-empty Gatorade bottle, or any box might do—and plausibly represent it as a bomb given the innumerable forms bombs take.[3]

We think some combination of these factors, and surely some others that escape us, helps to explain why bomb threats are so routinely hoaxes and are often interpreted as such by their targets. While we could not expect jurors to know precise figures, we would expect them to have a rough sense that bomb threats are frequently bogus. *See, e.g.*, FBI Statement on Bomb Threats to Polling Locations (Nov. 5, 2024) (noting that the "FBI is aware of bomb threats to polling locations in

---

[3] *See, e.g.*, *People v. Bracamonte*, 2019 WL 6124740, at *2 (Cal. Ct. App. Nov. 19, 2019) (defendants "constructed a fake bomb out of a couple of road flares, some wires, and black tape"); *United States v. Rodriguez*, 301 F.3d 666, 667 (6th Cir. 2002) (Styrofoam sandwich box); *United States v. Miller*, 206 F.3d 1051, 1052 (11th Cir. 2000) ("two red sticks with a fuse"); *United States v. Hart*, 226 F.3d 602, 603–04 (7th Cir. 2000) (bags and shoeboxes); *United States v. Zamora*, 222 F.3d 756, 760 (10th Cir. 2000) (gift-wrapped box); *United States v. Beckett*, 208 F.3d 140, 143-44 (3d Cir. 2000) (box with "an antenna and a lighted button on it"); *Paese v. United States*, 927 F. Supp. 667, 668 (S.D.N.Y. 1996) (attaché case with "three purple sticks and a transistor with wiring"); *State ex rel. Richey v. Butler*, 572 So. 2d 1043, 1043 (La. 1991) ("a piece of wood, crudely fashioned into a fake bomb by a wrap of electrician's tape and the embellishment of a woman's wristwatch").

several states," and that "[n]one of the threats have been determined to be credible"); Graeme R. Newman, Center for Problem-Oriented Policing, U.S. Dep't of Just., Bomb Threats in Schools, at 10 & n.† (2011) (noting "widely quoted statistic" that 90% of bomb threats in schools are hoaxes).

For those reasons, some additional evidence that Stubblefield had a bomb, beyond his mere claim, was necessary before jurors could rationally draw the conclusion that he in fact had a bomb, and that evidence was lacking here. No bomb or bombmaking paraphernalia was ever recovered, even though officers searched the residence where Stubblefield, who was apparently homeless, sometimes stayed. Neither teller ever saw a bomb or anything suggestive of one. And surveillance footage which captured Stubblefield's flight from the bank following the robbery showed Stubblefield handling his bag in a careless manner, not with the care one would expect of somebody handling a bomb. For instance, surveillance footage showed Stubblefield sprinting to catch a bus after the robbery with the bag banging against his leg and Stubblefield indisputably used the same bag to carry the cash from the robbery and a change of clothes for his getaway. This, of course, does not entirely foreclose the possibility that Stubblefield had a bomb in his bag, and it certainly does not undercut the wisdom of the tellers taking his threat seriously. But there was no material evidence corroborating Stubblefield's claim that he had a

bomb, which was necessary on these facts to conclude beyond a reasonable doubt that he in fact had one.

### 2. The Evidence Did Not Prove Either Teller Believed Stubblefield Was Armed

The government next and more forcefully argues that the evidence was sufficient to conclude that Stubblefield was apparently (rather than actually) armed with a bomb, i.e., that the tellers reasonably believed he had a bomb. We, again, disagree. We will grant the government, for the sake of argument, that a person in the tellers' shoes *might have* reasonably believed that Stubblefield had a bomb. Where the government's evidence falters is that it failed to prove that either teller in fact subjectively believed Stubblefield was armed with a bomb during the robbery.

At the outset, we clarify that what it means for a complainant to reasonably believe their assailant is armed is that they reasonably think that it is more likely than not the case. That is the most common understanding of what it means to believe something, i.e., that it is probably true. *See Webster's Third New International Dictionary* 200 (3d ed. 2020) (defining "belief" as "conviction of the truth of some statement"). And it is the meaning of the word that best comports with our precedents. *See, e.g.*, *Washington*, 135 A.3d at 330 ("The fact that the victim perceived the item in appellant's hand to be a firearm and the jury credited the victim's testimony that she perceived the item to be a firearm, was enough for that

object to be considered a dangerous weapon."); *Paris*, 515 A.2d at 204 (focusing on what the "victim perceive[d]" and "plainly believed"); *Harris*, 333 A.2d at 400 ("[A]pparent ability through the eyes of the victim is required.").

*Hartley* best illustrates the point that to believe that somebody is armed means to think that they more probably than not are. In that case, Hartley attempted to rob a man on a train platform by putting his hand in his pocket and claiming to have a gun, though no gun was ever displayed or recovered. 117 A.3d at 1036. The complainant testified that he did not believe Hartley had a gun during the encounter, but he did not suggest there was no possibility that his assailant had a gun. *Id.* In reversing Hartley's conviction for assault with intent to rob while armed, we stressed that the complainant testified "that he did not believe that [Hartley] actually had a gun." *Id.* at 1036; *see also id.* at 1038 & n.7. We noted that point as critical to distinguishing *Smith*, because "unlike the witnesses in the *Smith* case, the victim here testified that he did not believe that appellant was armed with a firearm." *Id.* at 1038. We thus concluded that there was insufficient evidence that Hartley was armed or apparently armed during the assault because he did not instill the subjective belief in his victim that he in fact had a gun. *Id.* at 1038-39.

While the government does not now seem to dispute that to believe somebody has a dangerous weapon equates to thinking that they probably do, the briefing

generally elides the topic, and the trial prosecutor suggested otherwise. For example, in closing the prosecutor argued that this was "quintessentially armed robbery" because the tellers "certainly thought that there was a bomb in [the] bag *enough* to give [Stubblefield] $10,000," they were "*very concerned* [Stubblefield] had a bomb," and "[t]hey did not think that there was *no chance* this guy had a bomb." (emphases added). That proposed "mere possibility" standard is (1) tough to reconcile with cases like *Hartley*, where the victim did not suggest there was no possibility his assailant was armed, and (2) would seriously risk converting virtually all robberies into armed robberies, since the victim of any robbery might reasonably think their assailant was possibly armed even absent any representation of an arm. *But see State v. Williams*, 95 A.3d 721, 731 (N.J. 2014) (where "the victim believes that the robber *may be armed* with a deadly weapon," that satisfies "the actual-belief requirement" of New Jersey's "while armed" statute).

The District's while armed enhancement is a serious criminal enhancement that can drastically increase a defendant's sentencing exposure, sometimes by decades. *See* D.C. Code § 22-4502. It would cheapen the severity of this offense to permit it to be tacked onto every robbery whenever the victim reasonably fears the mere possibility that their assailant is armed, as they virtually always might reasonably fear, just as virtually any robber might intend to instill that fear even when they make no mention of a weapon. So we stick to the ordinary meaning of

what it means for a victim to believe their assailant is armed, which is that they

believe, more probably than not, that their assailant is armed.[4]

As in *Hartley*, there was insufficient evidence here to convict Stubblefield of

the robbery "while armed" offense because there was insufficient evidence to prove

that any victim subjectively believed he had a weapon. Recall that Turner testified

only that she thought "there was *a possibility* [the robber] had a bomb," but she was

never asked if she believed that he did. And Sash testified that there was "definitely

a possibility" that the robber had a bomb, but when pressed about whether he actually

thought the robber had a bomb, he answered, "I guess I didn't." The jurors could

---

[4] We acknowledge that putting somebody even in the slightest fear of a dangerous weapon is of course worse than creating no such fear at all, so that it can be tempting to treat Stubblefield's conduct as something more culpable than the already serious offense of a robbery, and categorizing it as an armed robbery. But that is a pernicious instinct. Just because Stubblefield's conduct is worse than it would have been had he merely robbed the bank absent any threat, no matter how implausible, it would have been worse still if he had made the tellers think he probably had a dangerous weapon, and even worse yet if he in fact had a dangerous weapon. So to treat Stubblefield's conduct as on par with somebody who actually had a bomb—regardless of whether he did or anybody even believed he did—trivializes the very real danger that actual bombs pose over hypothetical ones, and the added psychological pain that one who is put in actual harm's way suffers beyond one who merely thought there was some possibility that they might be in harm's way for a moment in time. The plain text of § 22-4502(a) applies only to those who are "armed with or hav[e] readily available" a dangerous or deadly weapon. While this court has put a judicial gloss on that statute to capture the less culpable conduct of creating the reasonable belief in the victim that one is armed, we will not enlarge the statute even further by reducing the actual-belief requirement down to a belief in a mere possibility of an arm, as the trial prosecutor encouraged the jury to do.

not rationally conclude beyond a reasonable doubt, from that evidence, that either teller subjectively believed that Stubblefield had a bomb.

The government persists that there was sufficient circumstantial evidence to conclude beyond a reasonable doubt that Sash and Turner believed Stubblefield had a bomb, despite Sash denying as much and Turner never being asked about that. It points to their testimony that Stubblefield threatened that he "had a bomb" and "would blow the place up," after which they felt afraid, hit the silent alarm, and handed over $10,000 in cash. But Sash's disavowal of any such belief precludes a finding beyond a reasonable doubt that he secretly harbored one and was just being coy.[5] And Turner's reaction to Stubblefield's threats is a paltry indication that she actually believed that Stubblefield had a bomb—as clearly evidenced by the fact that Sash acted in the same fashion despite disbelieving Stubblefield's claim. Even the slightest chance that Stubblefield was armed with a bomb, however implausible, might have prompted Turner to hand over the money rather than putting hers and others' lives at the slightest risk. Even if Turner were certain that Stubblefield did not have a bomb, there is no telling what violence a person who's willing to falsely

---

[5] The government suggests that a jury could conclude that Sash was putting on a front and actually did believe Stubblefield had a bomb. That is conceivable, perhaps, but no rational juror could draw so fanciful a conclusion beyond a reasonable doubt.

represent that they have a bomb might resort to, so that Turner's actions and fear are entirely consistent with (like Sash) disbelieving Stubblefield's claim. Because the government never probed Turner's actual beliefs—it never asked the question critical to its case, perhaps fearing the answer—the factfinder was left to speculate about them.

"[W]hile 'a jury is entitled to draw a vast range of reasonable inferences from evidence, it may not base a verdict on mere speculation.'" *Rivas*, 783 A.2d at 134 (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990)); *see also In re D.P.*, 996 A.2d 1286, 1288 (D.C. 2010) ("[S]ome relevant evidence in the record in support of each essential element of the charged offense" is not enough to satisfy the requirement of proof beyond a reasonable doubt. (quoting *Rivas*, 783 A.2d at 134)). Where the evidence at trial tends to support with equal force both the existence and nonexistence of an essential element, it fails to "eliminate the possibility that the factfinder's verdict was based on surmise or conjecture" and is insufficient as a matter of law. *Ross v. United States*, 331 A.3d 220, 224 (D.C. 2025) (quoting *Long*, 156 A.3d at 713).

No rational factfinder could conclude beyond a reasonable doubt that Sash or Turner believed Stubblefield had a bomb, a conclusion the jury's instructions

(erroneously) did not even require them to arrive at.[6] Sash expressly stated he did not believe that. And Turner's reactions to the threat—not materially different from Sash's—are just as easily explained by her unwillingness to undertake even a remote risk that Stubblefield had a bomb, or the risk that he would otherwise act out violently if defied, even if she did not believe that he had a bomb.

---

[6] The jurors were not instructed that, in order to convict, they had to find that either teller subjectively believed that Stubblefield had a bomb. Recall that the court instructed the jury that it should convict Stubblefield of armed robbery if he acted "in a manner *that is intended* to lead the complainant reasonably to believe that [he had] an object that would cause death or serious bodily injury," (emphasis added), with no clear requirement that either complainant actually held that belief. While that instruction is approved of in the model jury instructions, *see* Criminal Jury Instructions for the District of Columbia, Comment to No. 8.101 (5th ed. 2024), it omits our precedents' actual belief requirement. That omission should be corrected in future editions of the model instructions and by trial judges in the meantime. *See Alleyne*, 327 A.3d at 487 n.14 ("Although the District's 'widely used' form instructions provide a helpful guide, they are 'not the law.'") (quoting *Lucas v. United States*, 240 A.3d 328, 343 n.12 (D.C. 2020)). Stubblefield did not object to the court's instruction, and he does not raise an instructional error claim on appeal, so this is not an independent ground for reversal despite the apparently erroneous and seemingly pivotal instruction. We note the court's instructions simply to highlight that the jury's verdict is not an indication that they concluded beyond a reasonable doubt that Stubblefield in fact had a bomb, or that the tellers subjectively believed that he did. Any such conclusion would be irrational on this evidence, in any event, but it seems most likely that the jury convicted on the legally infirm basis that Stubblefield intended to instill fear of a bomb, and that it would have been reasonable for somebody in the tellers' shoes to believe him.

### III. Conclusion

For the foregoing reasons, we reverse Stubblefield's conviction for robbery while armed, remand for entry of a conviction on the lesser included robbery offense, and affirm the rest of his convictions.

*So ordered.*

MCLEESE, *Associate Judge*, concurring in the judgment in part and dissenting in part: I concur in the part of the judgment affirming Mr. Stubblefield's convictions on offenses other than armed robbery. *Ante* at 27. I respectfully dissent from the part of the judgment reversing Mr. Stubblefield's conviction for armed robbery on the ground that the evidence was insufficient to permit the jury to find beyond a reasonable doubt that Mr. Stubblefield had a bomb during the robbery. *Id.* at 15-19.

The opinion for the court accurately states our deferential standard of review. *Ante* at 12-13. We must view the evidence in the light most favorable to the verdict and accord deference to the factfinder's authority to weigh the evidence, determine credibility, and draw reasonable inferences. *Id.* at 12. We must affirm if the evidence is sufficient to permit any rational factfinder to find the elements of the charged offense beyond a reasonable doubt. *Id.* I would add that jurors "surely could use [their] common sense and everyday experience to infer reasonably from the

evidence." *Hebron v. United States*, 837 A.2d 910, 914 (D.C. 2003) (internal quotation marks omitted). Applying those principles, I would uphold the jury's finding that Mr. Stubblefield was guilty of armed robbery.

The opinion for the court also accurately describes the pertinent facts. *Ante* at 3-4. In brief, Mr. Stubblefield went into a bank and demanded money; stated that he had a bomb and would blow the place up; pointed to a bag he was carrying when making those statements; obtained money; and left the scene without being apprehended. *Id.* The question is whether the jury could reasonably have credited, beyond a reasonable doubt, Mr. Stubblefield's statement that he had a bomb. I would answer that question in the affirmative.

We decided a similar question in *Smith v. United States*, 777 A.2d 801 (D.C. 2001). In *Smith*, the defendant took money from a restaurant cash register. *Id.* at 803. As the defendant did that, his hand was in his jacket pocket and was pointed at restaurant employees. *Id.* at 803-04. When an employee approached, the defendant threatened to shoot. *Id.* at 804. The defendant then fled the scene. *Id.* Although employees believed that the defendant had a gun in his pocket, they never saw a gun, and no gun was ever recovered. *Id.*

We held in *Smith* that the evidence was sufficient to permit the jury to find beyond a reasonable doubt that the defendant was armed. 777 A.2d at 809-13. We

noted that it was "the jury's province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence." *Id.* at 810 (internal quotation marks omitted). We also noted that "the essential elements of a crime may be proven by circumstantial evidence." *Id.* at 813 (internal quotation marks omitted). We discussed a number of cases involving "similar factual situations" in which this court had "relied almost exclusively on circumstantial evidence" to uphold the sufficiency of the evidence to support a jury finding that a defendant was armed. *Id.* at 810-12.

In *Smith*, we also discussed with approval two similar cases in which the D.C. Circuit concluded that the evidence was sufficient to support the jury's finding that a bank robber was armed even though no weapon was observed or found. 777 A.2d at 811-12. We quoted from the first in part as follows:

> The most telling item consisted of [the defendant's] threat to blow the teller's head off. Loaded guns are capable of just that. From [the defendant's] threat, therefore, one could reasonably infer—the teller certainly did—that [the defendant] meant what he said and that he had a gun to back it up. [The defendant's] reaching into his pocket while uttering his threat increases the probability that the teller was right. The testimony of the get-away driver points in the other direction, but when we view what the prosecution presented in a light most favorable to it, we believe a jury reasonably could find that [the defendant] had a firearm.

777 A.2d at 812 (quoting *United States v. Ray*, 21 F.3d 1134, 1141 (D.C. Cir. 1994) (footnote omitted)).

We explained that in the second of the two D.C. Circuit cases, *United States v. Levi*, 45 F.3d 453 (D.C. Cir. 1995), the court "suggested that a robber's statement indicating possession of a dangerous weapon can be sufficient, by itself, to support a conviction under the federal aggravated bank robbery statute." *Smith*, 777 A.2d at 812 n.19.

Turning to the facts before us in *Smith*, we said that the defendant "verbally brandished" a weapon, by threatening to shoot the employees and by holding his hand in his jacket and pointing through the jacket at employees. 777 A.2d at 813 (brackets and internal quotation marks omitted). We also explained that the employees believed that the defendant had a gun. *Id.* Finally, we stated that "[b]ecause additional evidence exists in this case, we need not decide whether [the defendant's] statement that he would 'shoot' would alone be sufficient to support his conviction." *Id.* at 812 n.19

I view *Smith* as quite comparable to the present case. I acknowledge, however, that *Smith* is not directly controlling. I see two principal differences between this case and *Smith*. First, the employees in *Smith* testified that they believed that the defendant had a gun, 777 A.2d at 813, whereas the employees in

the present case were more equivocal as to whether they thought Mr. Stubblefield had a bomb, *ante* at 24-25. I acknowledge the relevance of that difference. *See Hartley v. United States*, 117 A.3d 1035, 1038 (D.C. 2015) (distinguishing *Smith* in part on basis that victim in *Hartley* did not believe defendant had weapon). I do not, however, see that difference as warranting reversal in the present case. Rather, the reasonableness of a jury's inference that a defendant was armed turns far more on the objective circumstances than on the subjective beliefs of the victims. In other words, I do not believe that *Smith* should have come out differently if the employees there had happened to be less confident as to whether the defendant had a gun. Nor do I believe that the outcome in this case should turn on the degree of subjective belief of the bank employees.

I note that although we held in *Hartley* that the evidence was insufficient to support a conclusion that the defendant was armed, there is a critical difference between the facts of *Hartley* on one hand and the facts of this case and *Smith* on the other hand. In *Hartley*, the defendant attempted to rob the victim, claiming to have a gun and holding his hand in his pocket as though he had a gun. 117 A.3d at 1036. Someone called the police, who arrested the defendant on the scene of the assault. *Id.* The police found no firearm on the defendant's person or in the area in which the assault took place. *Id.* at 1036, 1038. Evidence that the defendant was arrested on the scene and no weapon was found on him or in the surrounding area seriously

undermined the reasonableness of any inference that the defendant in fact was armed, as we emphasized in *Hartley*. *Id.*; *see also, e.g.*, *Levi*, 45 F.3d at 457 (describing fact that defendant was arrested on scene and no weapon was found as "overwhelming evidence" contradicting inference that defendant was armed). In contrast, like the defendant in *Smith*, Mr. Stubblefield fled the scene without being apprehended, and thus there was no evidence directly undermining an inference that Mr. Stubblefield was telling the truth when he stated that he had a bomb.

The second difference between this case and *Smith* is the type of weapon at issue: a gun in *Smith* and a bomb in this case. I acknowledge the relevance of this difference, but I also do not view the difference as warranting a difference in outcome. It seems to me that a rational juror, using common sense and everyday experience, could have thought: (1) Mr. Stubblefield said that he had a bomb; (2) he gestured toward a bag that could reasonably have contained an explosive device; (3) improvised explosive devices are not that hard to make; (4) people do sometimes use explosive devices to rob banks; (5) people who rob banks have a motive to bring real weapons rather than merely bluffing, so that they have something to display to increase the level of fear and coercion if necessary; and (6) there is no direct evidence that Mr. Stubblefield's statement was false. I therefore would hold that the evidence was sufficient to support a finding beyond a reasonable doubt that Mr. Stubblefield truthfully stated that he had a bomb.

I respectfully disagree with the opinion for the court on several points. First, the opinion for the court refers in a footnote to information that is in the record but was not before the jury. *Ante* at 15 n.2. As the opinion for the court correctly acknowledges, however, that information may not be considered in deciding the sufficiency issue we are resolving. *Id.* I see no valid reason to mention that information.

Second, the opinion for the court notes that the prosecutor's closing argument rested more heavily on the theory that Mr. Stubblefield was guilty of armed robbery because Mr. Stubblefield intentionally caused the tellers to believe that he had a bomb. *Ante* at 15-16. The opinion for the court does not explicitly state that the amount of emphasis a party gives to a theory in closing argument is relevant to this court's assessment of the sufficiency of the evidence to support that theory. *Id.* Rather, the opinion for the court explains that the prosecutor did not abandon the theory that Mr. Stubblefield actually had a bomb, the jury was instructed on that theory, and the court therefore considers the theory in assessing the sufficiency of the evidence. *Id.* at 16. I see no reason to sua sponte address and reject an issue-preservation argument that no one has raised. In any event, and to address any possible implication of the opinion for the court, in my view the degree of emphasis a party gives to a theory in closing argument is irrelevant to the question whether the evidence before the jury was sufficient to support a finding on that theory. *See, e.g.,*

*State v. Bahr*, 414 P.3d 707, 712 (Idaho Ct. App. 2018) (closing arguments are not evidence, and defendant's "assertion that the State's closing argument is relevant to his sufficiency of evidence claim fails").

Third, the opinion for the court concludes that Mr. Stubblefield's statement that he had a bomb was so implausible that the jury could not reasonably have credited the statement in the absence of corroboration that was lacking in this case. *Ante* at 17-19. In support of that conclusion, the proposed opinion makes what I count as seven specific points. *Id.* I respectfully disagree with the reasoning of the opinion for the court:

(1) The opinion for the court states that jurors undoubtedly know that bombs are far less common than firearms. *Ante* at 17. I assume that is true, but I do not view that point as supporting reversal. The issue is not whether Mr. Stubblefield's statement would have been more plausible if Mr. Stubblefield had said that he had gun. Rather, the issue is whether Mr. Stubblefield's statement that he had a bomb was so implausible that corroboration of that statement was required. An observation that guns generally are far more common than bombs does not support the latter conclusion. For example, I assume that knives are far more common than guns, but that does not make the claim to have a gun implausible. In other

words, that guns are more common than bombs in my view says virtually nothing about whether the use of bombs to rob banks is so rare that a jury cannot reasonably credit a defendant's admission to doing that unless the admission is corroborated.

(2) The opinion for the court states that bombs are high-risk weapons. *Ante* at 17. That seems to me to be a common-sense point as far as it goes, but I do not view the point as providing significant support to the court's holding. Common sense suggests that people who rob banks are not risk averse, and robbing a bank with a gun seems in and of itself a quite risky activity. I do not think that jurors exercising their common-sense would be required to view it as implausible that someone who was willing to take the risk of robbing a bank would also be willing to take the additional risk of bringing an explosive device rather than a firearm.

(3) The opinion for the court states that bombs are not as useful as firearms for purposes of robbery because bombs can only be deployed once. *Ante* at 17. That also seems a common-sense point as far it goes. If the issue for us were whether a firearm or a bomb is the better weapon to use in a robbery, that would be a point in favor of firearms. On the other hand, as the opinion for the court acknowledges, *id.* at 17-19, bombs can be more effective

than guns at deterring a response.  More generally, it seems to me that a reasonable juror exercising common sense could doubt that the typical bank robber conducts the kind of detailed weighing of pros and cons reflected in the opinion of the court before picking a weapon (or deciding what kind of weapon to falsely claim to have, for bank robbers who choose to go that route).

(4) The opinion for the court states that falsely claiming to have a bomb is a better bluff than falsely claiming to have a gun, because victims are more likely to demand confirmation of the latter than the former.  *Ante* at 17-18.  The opinion for the court identifies no support for that statement, and I personally have no idea whether it is true.  I see no basis for concluding that a juror who failed to give weight to this unsupported hypothesis would be lacking in common sense.

(5) The opinion for the court states that it is easier to display a plausible fake bomb than to display a plausible fake firearm.  *Ante* at 18.  There was no evidence on this point at trial, and the point does not seem to me to be something that a juror using common sense would be obliged to take into account.  To the contrary, my guess would be that plausible imitation firearms are far more common than plausible fake explosive devices.  In support of its statement, the opinion for the court cites a few cases involving fake explosive

devices. *Ante* at 18 n.3. Imitation firearms, however, are sufficiently common that they are specifically addressed in the District of Columbia's weapons statutes. *E.g.*, D.C. Code § 22-4504(b); *see also Washington v. United States*, 135 A.3d 325, 329 (D.C. 2016) ("An imitation pistol is any object that resembles an actual pistol closely enough that a person observing it in the circumstances would reasonably believe it to be a pistol.") (internal quotation marks omitted). I am confident that one could cite dozens of cases involving plausible imitation firearms. *See, e.g.*, *United States v. Arafat*, 789 F.3d 839, 847 (8th Cir. 2015) (defendant used modified toy gun to rob banks, and victims believed gun was real).

(6) The opinion for the court states that it expects jurors to "have a rough sense that bomb threats are frequently bogus." *Ante* at 18. No evidence was introduced at trial about the frequency with which bomb threats are determined to have been fake, and Mr. Stubblefield did not raise the point either at trial or in this court. In support of the point, the opinion for the court cites some government statistics relating to bomb threats to polling places and schools. *Id.* at 18-19. The jury would not have been able to consider such extra-record statistics in rendering its verdict, and I am doubtful that it is appropriate for this court to do so on appeal. In any event, the cited statistics do not seem very relevant because they involve places—schools and polling

places—where it would be easy and relatively risk free to call in and falsely claim to have left a bomb. Neither those statistics nor such common sense as I may possess leads me to have any idea how common it is for a bank robber to falsely rather than truthfully claim to have an explosive device. I certainly do not believe that a juror who decided that Mr. Stubblefield's statement about having a bomb was true would have been lacking in common sense.

(7) The opinion for the court indicates that surveillance footage of Mr. Stubblefield after the robbery tends to undermine an inference that Mr. Stubblefield had a real bomb because the bag appeared light and Mr. Stubblefield carried the bag carelessly. *Ante* at 15 n.2, 19. Mr. Stubblefield did not make such an argument in the trial court and does not make the argument in this court, so the argument rests entirely on the impressions of the judges joining the opinion for the court. I have reviewed the surveillance footage, and I personally see no basis for a conclusion that the bag appears too light to contain an explosive device. I certainly see no basis on which to think that any reasonable juror would have had to reach that conclusion upon viewing the surveillance footage. I can agree that Mr. Stubblefield carries the bag in a manner that is more cavalier than I would be inclined to be with a bag containing an explosive device. On the other hand, Mr. Stubblefield had a strong motive to hurry during the time at issue,

to escape from the scene of the robbery. Moreover, in my view a reasonable juror could take the view that Mr. Stubblefield—who decided to rob a bank while stating that he had a bomb—is not very risk averse.

As noted, the approach reflected in the opinion for the court is that Mr. Stubblefield's statement that he had a bomb was so implausible that further corroboration was required. *Ante* at 15-19. For the reasons just discussed, I do not view this case that way. In *Levi*, the D.C. Circuit expressed the view that a defendant's statement during a robbery that he had a gun "by itself is sufficient evidence to convict unless contradicted by overwhelming evidence." 45 F.3d at 457. I would not go that far, but I do believe that ordinarily the jury is free to believe such a statement beyond a reasonable doubt, barring contrary evidence making such belief unreasonable.

A robber's statement during a robbery claiming to be armed is plainly a statement against the robber's penal interest, and such statements are viewed as generally reliable because "reasonable people usually do not make statements against their penal interest unless the statements are true." *Bost v. United States*, 178 A.3d 1156, 1196 (D.C. 2018) (internal quotation marks omitted). Moreover, barring unusual circumstances, it is generally the jury's prerogative to determine whom to believe. *Cf. generally, e.g.*, *Slater-El v. United States*, 142 A.3d 530, 538-39 (D.C.

2016) (general rule is that credibility is for factfinder; exception for inherent incredibility can be invoked only where testimony can be disproven as matter of logic, is highly questionable in light of common experience and knowledge, or is strongly at variance with normal expectations about human behavior). Finally, when reviewing the sufficiency of the evidence to support a verdict, we are required to respect the jury's broad authority to draw reasonable inferences and to use its common sense. *See, e.g.*, *Hebron*, 837 A.2d at 914 (The "jury surely could use its common sense and everyday experience to infer reasonably from the evidence.") (ellipsis and internal quotation marks omitted).

I do not wish to overstate my conclusion. Had I been a juror, I think that I likely would have had a reasonable doubt as to whether Mr. Stubblefield's statement about having a bomb was true. Our function on appeal, however, is quite different from the function of the jury. In my view, the opinion for the court does not reflect adequate deference to the jury's authority to draw reasonable inferences and instead relies on a series of attenuated and debatable distinctions between guns and bombs to depart from the approach reflected in decisions such as *Smith*. I also note that the opinion for the court cites no factually comparable case in support of its holding. I therefore respectfully dissent from the holding of the opinion for the court that the evidence was insufficient to permit reasonable jurors to conclude beyond a

reasonable doubt that Mr. Stubblefield was telling the truth when he said that he had a bomb.

Given the foregoing conclusion, I have no need to reach the other issues decided by the opinion for the court.